167 S.W.3d 636 (2005)
In the Interest of W.R.E., K.N.E., and B.A.C., Children.
No. 05-04-00457-CV.
Court of Appeals of Texas, Dallas.
July 18, 2005.
*637 Timothy Ray Haney, Attorney At Law, and Joe Neal Smith, Sherman, TX, for Appellant.
Stephan Love, Grayson County Attorney's Office, Rainey Lynn McClung Webb, Sherman, TX, for Appellee.
Joseph David Brown, County Attorney, Sherman, TX, for State.
Before Justices WHITTINGTON, MOSELEY, and LANG-MIERS.

OPINION
Opinion By Justice LANG-MIERS.
William Raymond Elrod II appeals the trial court's judgment, following a jury trial, terminating his parental rights to his children W.R.E., K.N.E., and B.A.C. In four issues, he contends the evidence was legally and factually insufficient to support the trial court's judgment. We affirm.

BACKGROUND
Elrod lived with Nancy Cruz for five years, and they had a son, W.R.E., and a daughter, K.N.E., together. Cruz had another daughter, I.C., whom Elrod treated as his own.[1]
*638 On October 2, 2002, Misty Wade Pryor, a Child Protective Services ("CPS") employee, went to the parents' home on a referral of physical neglect. Because she feared that the children had been left alone in the house when no one answered the door, she called a family services investigator with the police department. Before the investigator reached the home, Cruz came to the door and allowed Pryor inside. In the house, Pryor saw two-year-old W.R.E. lying in a crib with flies covering his mouth and could not tell whether he was breathing. Four-year-old I.C. was sitting in a toddler bed with a soiled blanket. One-year-old K.N.E. was also lying in a toddler bed. All three children were covered in fleas, lice, and scabies and were wearing soaked and soiled diapers. I.C.'s scalp was bleeding and raw, and she had blood under her fingernails.
Pryor and the investigator observed dirty sheets on some beds, and dirty clothes and a bowl of spilled cat food on the floor. They testified that the children's room smelled strongly of cat feces. Pryor described the general condition of the house as "deplorable." The investigator stated that the house was one of the five dirtiest he had seen in his twenty-seven years in law enforcement and that, due to the amount of animal feces present, he considered the condition of the house to be a danger to the physical health of the children. Pryor and the investigator testified that the children were nonresponsive and seemed unemotional.
Elrod was not present and it appeared that Cruz, who was pregnant at the time, was in charge of the children. However, Cruz referred Pryor to Elrod regarding questions about income and the children's shot records.
Pryor removed the children from the home and took them to an emergency room for medical care. There, the children were given juice and cookies. W.R.E. ate quickly, became ill, and vomited juice and cat food.

Home Visits
About fourteen days after the children were removed, a court appointed special advocate went to the parents' home. At that time, the house did not look as bad as it had in pictures she had seen from the day the children were removed, but was not clean. There was a strong urine odor in the house, cat feces on the carpet, and mouse droppings in the cabinet. A litter box and cat food were on the floor in the children's room. The bathroom in the children's room was dirty, and a roach was floating in the toilet. She later visited the parents at a different house and observed dirty dishes in the sink.
Melody Wheeler, an ongoing case worker for CPS, visited the parents in April of 2003 at a different house than the one from which the children were removed. She observed piles of trash everywhere in the house. She also testified that the house's odor was so strong she could smell it from outside and had to take periodic breaks to breathe during her visit. She did not see signs of cats during this visit.

Children's Development
Wheeler met with the children after they were removed from the home. When she first met them, they were all behind developmentally. W.R.E. could not stand, and I.C. was not potty trained, would not stand up for a diaper change, and had no facial expressions. Within a few months, she observed notable improvement in the children's development.
A psychologist and development consultant testified that the children had significant developmental and behavioral delays and that they might be set back developmentally if sent back to an environment where they had been neglected. She also *639 testified that the children's pediatricians diagnosed I.C., W.R.E., and K.N.E. with failure to thrive.
I.C.'s foster mother testified that I.C. was nearly four years old and still wearing diapers when she came to live with her. She was like a zombie and did not show emotions, could not speak, and did not know how to drink from a cup or straw or to use utensils. She had scabies, lice and fleas in her hair, and a bleeding scalp, and was behind on her vaccinations.
W.R.E. and K.N.E.'s first foster mother testified that the children were covered in body and head lice when they were placed with her. K.N.E. was fourteen months old and could not sit up on her own. Three-year-old W.R.E. could barely walk and talk. Neither child smiled. Their second foster mother stated that W.R.E. was like a zombie when he was placed with her, that he could not run well, and that he ate every meal as if it would be his last. She stated that both children had progressed significantly after being placed with her.
W.R.E.'s teacher testified that although he was delayed in speech, gross motor, and fine motor skills, he had progressed well since starting school.

Parents' Progress
Wheeler met with the parents at a hearing held within two weeks of when the children were removed and again later to discuss their CPS service plan. At the hearing, both parents appeared lice-infested and had extremely strong and offensive body odor. Elrod told Wheeler that he believed he was a good parent and did not see the need for CPS to be involved. The parents' hygiene was still a problem when they met to discuss the service plan. The parents were not granted visitation with the children because of the lice and body odor, which posed a risk to the children. Elrod obtained a report from the health department, stating that he was lice-free. When she met with Elrod for a third time, he was no longer living with Cruz, but still had extreme body odor.
The parents' counselor testified that she did not see much progress in the parents. They did not follow through with her suggestions on housekeeping, life management, nutrition, and hygiene. She did not think it would be proper to send the children home with either parent.
The social worker who taught the parenting classes thought the children would be endangered if they were sent back to the home.
According to Wheeler, although the original plan was family reunification, CPS eventually decided to seek termination of both parents' parental rights based on the results of the psychological evaluations, the counselor's recommendation, and the lack of the parents' participation in the parenting classes.

Elrod's Testimony
Elrod testified that he had been at home on the morning the children were taken, but was at work when Pryor was there. He attempted to keep the house clean, but became discouraged because Cruz would not cooperate with his efforts. Although he did not know about the fleas, he attempted to treat the children's lice, but could not get it under control. He admitted that he had problems with his hygiene and with housekeeping, but stated that he cleaned the house soon after the children were removed. He took primary responsibility for the children, and admitted he had not left the children in a clean environment. He testified that I.C. and W.R.E. could both walk and that K.N.E. could sit up on her own at the time they were removed from the home.
He separated from Cruz in order to get his children back. He testified that although *640 she never physically harmed the children, he felt it necessary to separate from her because she did not clean the house. He also testified that he hired another counselor to assist him in preparing his home for the return of his children.

Testimony from Elrod's Church
Elrod testified that he took his children to church four times a week. His pastor testified that Elrod brought the children to his church for the past four years and that the children seemed happy and well-adjusted. He said the children came to church clean. He and his wife were aware that the children had lice at one time and had attempted to help Cruz treat them. Nursery workers from the church testified that the children came to church clean and well-dressed and that they had no knowledge of a problem with lice.

B.A.C.
At the time the other children were removed from the home, Cruz was pregnant with B.A.C. The court appointed special advocate assigned to the parents testified that they obtained prenatal care while Cruz was pregnant. On February 4, 2003, B.A.C. was born at a hospital in Oklahoma. CPS took him directly from the hospital and brought him to Texas.

CASE PROCEDURE
The jury considered the parent-child relationship between Elrod and W.R.E., K.N.E., and B.A.C. It found by clear and convincing evidence that Elrod (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children; (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children; (3) failed to support the children in accordance with his ability during a period of one year ending within six months of the date of the filing of the petition; and (4) failed to comply with the provisions of a court order necessary for Elrod to obtain the return of the children who have been in the permanent or temporary managing conservatorship of the Department of Protective and Regulatory Services for not less than nine months as a result of the children's removal from the parent under Chapter 262 for the abuse or neglect of the children. Elrod contends that the evidence is legally and factually insufficient to support termination on any of these four grounds. The jury also found by clear and convincing evidence that the termination of the parent-child relationship between Elrod and the children was in the children's best interest, but Elrod does not appeal this finding.

STANDARD OF REVIEW
Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence. Tex. Fam.Code Ann. § 161.206(a) (Vernon 2002); In re J.F.C., 96 S.W.3d 256, 263-64 (Tex.2002). The clear and convincing standard creates a higher burden to fulfill because of the severity and permanency of terminating the parent-child relationship. In re J.W., 152 S.W.3d 200, 204 (Tex.App.-Dallas, pet.denied). Accordingly, an appellate court must also have a higher standard when reviewing the legal and factual sufficiency of the evidence. In re J.F.C., 96 S.W.3d at 264-65; In re C.H., 89 S.W.3d 17, 26 (Tex.2002).
In reviewing the legal sufficiency of the evidence to support a termination finding, this court looks at all the evidence, in the light most favorable to the finding, to determine whether a reasonable trier of fact could have formed a firm *641 belief or conviction that its finding was true. In re J.F.C., 96 S.W.3d at 266. In doing so, we presume that the factfinder settled disputed facts in favor of the finding if a reasonable factfinder could do so. Id. As a corollary, we disregard all evidence that a reasonable factfinder could have disbelieved or found incredible. Id.
When reviewing the factual sufficiency of the evidence supporting a termination finding, we inquire as to whether all the evidence, both in support of and contrary to the trial court's finding, is such that a factfinder could reasonably form a firm belief or conviction about the truth of the petitioner's allegations. In re C.H., 89 S.W.3d at 27-29. Further, we consider whether the disputed evidence is such that a reasonable factfinder could not have reconciled that disputed evidence in favor of its finding. In re J.F.C., 96 S.W.3d at 266. If the disputed evidence is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. Id.

TERMINATION OF PARENTAL RIGHTS
Section 161.001 of the family code permits a court to order termination of parental rights if two elements are established by clear and convincing evidence. Tex. Fam.Code Ann. § 161.001 (Vernon 2002). First, the parent must have engaged in any one of the acts or omissions itemized in the first subsection of the statute. Id. § 161.001(1); In re J.W., 152 S.W.3d at 204-05. Second, termination of the parent-child relationship must be in the best interest of the child. § 161.001(2); In re J.W., 152 S.W.3d at 204-05.
In Elrod's second issue, he contends that the evidence was legally and factually insufficient to support the allegation that he engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children. Under subsection 161.001(1)(E) of the family code, the court may terminate the parent-child relationship if it finds, by clear and convincing evidence, that the parent has engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child. § 161.001(1)(E).
"Endanger" means to expose to loss or injury; to jeopardize. In re M.C., 917 S.W.2d 268, 269 (Tex.1996). Although "endanger" means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury. Id. at 269. Rather, it is sufficient that the child is exposed to loss or injury. Texas Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.1987).
Subsection (E) refers to the parent's conduct, as evidenced not only by the parent's acts, but also by the parent's omissions or failures to act. In re J.W., 152 S.W.3d at 204. Texas courts look to what the parent did both before and after the child's birth to determine whether a course of conduct endangering the child exists. Dupree v. Texas Dep't of Protective and Regulatory Servs., 907 S.W.2d 81, 83-84 (Tex.App.-Dallas 1995, no writ). If the evidence shows a course of conduct which has the effect of endangering the emotional well-being of the child, a finding under subsection (E) is supportable. In re C.J.F., 134 S.W.3d 343, 352 (Tex.App.-Amarillo 2003, no pet.).

ANALYSIS

Legal Sufficiency
After reviewing the evidence in the light most favorable to the finding, we *642 conclude that a reasonable trier of fact could have formed a firm belief or conviction that Elrod engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children.
The jury heard evidence that Elrod allowed the children to live in extremely unsanitary conditions. Elrod testified that he had the primary responsibility for the children's care. He left I.C., W.R.E., and K.N.E. with Cruz although he was aware of her unwillingness or inability to keep the house sanitary. When the children were removed, they were all covered with lice, scabies, and fleas, and one child was covered with flies. They were wearing soaked or soiled diapers. Later, at the emergency room, W.R.E. threw up cat food. The children were nonresponsive, developmentally and behaviorally delayed, and diagnosed with failure to thrive. Elrod himself admitted that the children should not have been living in such a condition. Even after the children were removed, Elrod continued to live in filthy conditions and to have poor personal hygiene.
By allowing W.R.E. and K.N.E. to live in such unsanitary conditions, Elrod endangered their health and physical well-being. See In re M.C., 917 S.W.2d at 270; see In re K.M.B., 91 S.W.3d 18, 24 (Tex.App.-Fort Worth 2002, no pet.). The evidence of Elrod's continued neglect to provide a clean and safe home environment for W.R.E. and K.N.E. and of his poor hygiene and unsanitary living conditions even after B.A.C. was born and removed from the hospital support a finding he also engaged in conduct endangering B.A.C.'s physical and emotional well-being. See In re C.J.F., 134 S.W.3d at 348(stating that if a parent abuses or neglects the other parent or children, that conduct can be used to support a finding of endangerment even against a child who was not yet born at the time of the conduct); Navarrette v. Texas Dep't of Human Res., 669 S.W.2d 849, 852 (Tex.App.-El Paso 1984, no writ) (allowing termination of parent-child relationship between mother and baby where mother lived in and allowed other children to live in unsanitary conditions while she was pregnant). Therefore, we conclude the evidence was legally sufficient under subsection (E) to support the termination of Elrod's parental rights toward W.R.E., K.N.E., and B.A.C.

Factual Sufficiency
We also conclude that all the evidence, both in support of and contrary to the jury's finding is such that a factfinder could reasonably form a firm belief or conviction about the truth of the petitioner's allegations. Elrod argues that he was not home when the children were removed and that it appeared to Pryor that Cruz was the primary caretaker of the children. However, Elrod testified to his own responsibility for the children's well-being. Elrod testified that he tried to keep the house clean before the children were removed, but that he gave up when Cruz would not cooperate in his efforts. Elrod testified that he cleaned the house soon after the children were removed, but the court appointed special advocate stated that the house was still filthy when she visited about fourteen days after the children were removed. Elrod obtained prenatal care for B.A.C., but did not remedy his unsanitary living conditions. His counselor testified that he and Cruz did not follow through with her suggestions on housekeeping, life management, and hygiene. Nursery workers from Elrod's church testified that they did not know the children had problems with lice, but the CPS workers and the children's foster parents testified that the children were covered *643 with lice, fleas, and scabies when they were removed. Elrod testified that I.C. and W.R.E. could stand and that K.N.E. could sit up on her own when they were living with him, but the CPS workers and the children's foster parents testified that they could not. Elrod obtained a certificate from the health department that he was lice-free, but there was also testimony that his personal hygiene did not improve.
Although there were some conflicts in the testimony, we will not substitute our judgment for that of the jury's. Golden Eagle Archery, Inc., v. Jackson, 116 S.W.3d 757, 761 (Tex.2003) ("[T]he jury is the sole judge of the credibility of witnesses and the weight to be given their testimony."). Viewing all the evidence in a neutral light, both in favor of and contrary to the trial court's judgment, we conclude that there is factually sufficient evidence to support the jury's finding that Elrod engaged in a course of conduct endangering the physical or emotional well-being of W.R.E., K.N.E., and B.A.C. Therefore, we overrule Elrod's second issue.
Because we conclude that the evidence is both legally and factually sufficient to support the jury's findings under subsection (E), and a finding as to any one of the acts or omissions enumerated in section 161.001(1) is sufficient to support termination, we need not address Elrod's other issues. See In re J.W., 152 S.W.3d at 207.

CONCLUSION
We conclude that the evidence is legally and factually sufficient to support the jury's finding that Elrod engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children. Having resolved this issue against Elrod, we need not address his other three issues. We affirm the trial court's judgment.
NOTES
[1] I.C. is not a subject of this appeal.