In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-19-00442-CV

IN THE INTEREST OF K.W. AND T.W.

**On Appeal from the 418th District Court
Montgomery County, Texas
Trial Cause No. 18-08-11585-CV**

**MEMORANDUM OPINION**

Mother and Father appeal the termination of their parental rights to Kim, a five year old child, and Todd, a two year old child.[1] In Mother's appeal, she argues that (1) the trial court erred when it terminated her parental rights under subsections 161.001(b)(1)(D) and (E) of the Texas Family Code, (2) the evidence is insufficient to prove that she failed to complete her service plan, and (3) it is not in her children's

---

[1] We identify children and their family members in parental-rights termination cases by using either initials or an alias to protect their identities. *See* Tex. R. App. P. 9.8(a), (b).

best interest for her rights to be terminated. *See* Tex. Fam. Code Ann. §§ 153.131(b); 161.001(b)(1)(D), (E). In Father's two issues on appeal, he argues that the evidence is legally and factually insufficient to terminate his rights under subsections 161.001(b)(1)(D) and (E). *Id.* § 161.001(b)(1)(D), (E). For the reasons explained below, we affirm the judgment of the trial court terminating Mother's and Father's parental rights.

## I.  Background

Deputy Prudencio Ochoa testified that on July 5, 2018, he was called to assist the Department of Family and Protective Services ("the Department") with a welfare check of two children. Deputy Ochoa stated that the location had multiple trailer homes, including one that had recently burned. The yard was also scattered with debris including garbage and scrap iron which, according to Deputy Ochoa, was completely unrelated to the fire. He stated the front yard was dangerous to children simply because it contained rusty metal and garbage that presented a tripping hazard for a young child.

When Deputy Ochoa approached the house, Father was in the yard and the Maternal Grandmother refused them entry into the home. After initially receiving resistance from Maternal Grandmother, she relented and allowed the officers into the home. Deputy Ochoa stated that in his experience, he classifies homes two ways,

2

either messy or dirty, and this house was "dirty." The home had a foul odor as soon as he entered, an odor that he described as a mixture of old animal feces and garbage. He stated that there was animal fecal matter on the floor and furniture, dirty dishes covered in old food, and garbage all over the house. He described every room in the home as dirty. Deputy Ochoa believed that the condition of the home could physically and emotionally endanger young children.

> I would say it's on the same level of danger [as the front yard] but a different kind of danger. Just the amount of germs, bacteria that a young child would be in contact with, especially one under the age of two that would more than likely be crawling around, climbing up on furniture. Like I said, there was animal feces all over the floor and the furniture that a young child would have been touching if they would have been in that situation.

Deputy Ochoa stated that Mother arrived at the home soon after he entered the residence. Mother arrived with people that the deputy knew from personal experience had long criminal records including, "[a]ggravated assault with a deadly weapon, unauthorized use of a motor vehicle, [and] drug use."

Deputy Dimitri Carpenter testified that he assisted Deputy Ochoa. He described the front yard of the home as having trash and a lot of debris. Deputy Carpenter stated that the home was really dirty and had a foul smell. He described the smell as a mixture of animal fecal matter and mold. He stated the condition of the home did not appear to be a recent problem, as there was old fecal matter, large

3

amounts of dirty clothes, and old dishes in the sink that were crusted and turning grey. Deputy Carpenter believed the home "was not an acceptable place for children." He stated that he did not see any drugs or drug paraphernalia in the home, and no one was arrested that day. Deputy Carpenter testified that the little girl, Kim, smelled and had dirt all over her. He said her appearance was consistent with someone who was not taking regular baths. The deputy conceded that the front yard was just a dirt yard, and he could not tell if the child was covered in old or new dirt. He also agreed that other than her appearance, Kim did not appear to be mistreated or abused.

At the conclusion of the welfare check on Kim and Todd, Mother and Father agreed to place the children with the paternal grandparents. However, the children were later placed with a foster family.

Department caseworker Noemi Lizano stated that she is the caseworker for both the parents and children in this case. Once the Department became involved, Lizano testified that it provided service plans to both parents for reunification with the children that required the parents, among other things, to complete psychological evaluations, drug and alcohol counseling, and drug screenings. Lizano described the parents as highly cooperative. Lizano stated that she observed visitations with the

4

parents and children, and the visits were appropriate. The children appeared to be bonded with their parents.

Lizano stated that the Department's goal changed from reunification to a decision to terminate Father's parental rights because of continued concerns over Father's drug use. While Lizano acknowledged that during the pendency of the case, some of Father's drug tests were found to be negative, Father's hair follicle tests continuously came back positive.[2] Hair follicle drug tests admitted at trial for Father showed consistent positive results for Methamphetamine and Amphetamine after the children's removal by the Department, including a positive hair follicle test two months before trial. Lizano stated that the positive drug tests concerned her because it demonstrated Father's "lack of judgment of safety for the children, put[ting] them in a dangerous situation." Because of Father's continued positive drug tests, the Department requested termination of Father's parental rights, and, in Lizano's opinion, it was in the children's best interest to terminate Father's parental rights.

While Mother's drug tests were negative, Mother showed poor judgment regarding the children's safety. Lizano testified that Mother insisted on maintaining a relationship with Maternal Grandmother, an admitted drug user, and with her

---

[2] According to Lizano, a urine analysis only tests for a period of three days prior to the test, while a hair follicle test examines drug use for a longer time period.

brothers who are "in and out of jail." Mother knew that Maternal Grandmother was using drugs but continued to maintain a relationship with her, telling Lizano, "this is my mom and she's my support." The continued relationship alarmed Lizano because Kim expressed fear of Maternal Grandmother to Lizano. Lizano stated that both of Mother's brothers are in and out of jail, and Mother allowed one brother to stay at her home during the pendency of this case, after his release from a psychiatric facility. The brother was living in Kim's room, although Kim was already out of the home and living with her foster parents at the time. Lizano stated that while the parents reported the brother had moved out, she had no way to verify their statement.

Lizano explained that the parents had moved to a different home, which she had recently visited. While the condition of their home was an improvement over their last home, "minor things" caused her concern. Lizano noted that the ceiling in Todd's room was leaking and "mushy[,]" there were loose cabinets, garbage and trash in the house and on the front porch, and things that needed to be child proofed. Lizano testified that the parent's situation had not improved enough to satisfy the Department and that the children would not be put back into a situation likely to cause them emotional or physical harm. Lizano believed that although Mother and Father's parenting skills significantly improved during the pendency of the case and the parents demonstrated appropriate relationships with the children during

6

visitation, the parents continued to show a lack of good judgment regarding their social circle of family and friends, and a lack of understanding about a safe environment.[3]

Lizano stated the children are "[v]ery bonded" with their foster family. The foster family lives in a two-story house, each child has their own room, the foster family is financially and emotionally able to meet the children's needs, and the children are in a stable and safe placement. She testified that the foster parents demonstrate excellent parenting skills and take the children to extracurricular activities such as ballet. The foster mother works in a daycare, has educational experience, and does educational activities with the children. The foster family would also be willing to adopt Kim and Todd.

Lizano stated that Kim is "brilliant" and demonstrates a "vocabulary [that] is just shocking, amazing." According to Lizano, Kim always wants confirmation that she is going back to the foster parents before and after visitation with Mother and Father. Lizano stated that although Todd did not verbalize his intentions, he is very bonded with the foster parents, and is "very excited" to see his foster parents after visitation with Mother and Father.

---

[3] Lizano did agree that Mother and Father were both employed as of the time of trial and had a stable home.

After being removed from his parents, Todd was diagnosed with food allergies, including "dairy, eggs, and wheat." Todd also has pulmonary issues, requiring breathing treatments while in the Department's care, making it dangerous for him to be around cigarette smoke. Lizano addressed this issue with both parents, and the parents began working on smoking outside of their home. Lizano stated their home still smelled of cigarette smoke, but the smell is "[n]ot strong[.]"

Kayla Barrientes testified as the guardian ad litem for the children. Barrientes said she recommended termination of Mother's and Father's parental rights, that termination is in the children's best interest, and that the children should remain in their current placement. Barrientes elaborated stating that she based her decision on Father's continued drug use, the couple's decision to remain around questionable family members, and their poor parenting judgment.[4] Barrientes testified that the parents' hygiene was better, but noted there was still room for improvement, and she continued to see poor choices regarding their personal hygiene.[5] Barrientes stated

---

[4] In regard to questionable parenting judgment, Barrientes noted one incident involving Father during visitation with Kim and Todd. The children were reaching for a toy under the sofa and could not reach the toy. Instead of reaching under the couch to retrieve the toy, Father lifted up the couch and instructed the children to go under the couch and grab the toy. Barrientes stated that if the couch had slipped out of Father's hand, it could have crushed the children.

[5] Specifically, Barrientes described an incident during one visitation at the Department's office where Mother gave Kim "the option . . . to wear shoes or not to go to the restroom in a public place and . . . the option whether to wash her hands or

8

that Mother and Father were instructed not to allow Maternal Grandmother to have any contact with the children. Mother and Father violated that instruction and even video-called Maternal Grandmother during one supervised visitation. Barrientes explained she had an ongoing concern about contact with Maternal Grandmother because of allegations voiced by Kim towards her.

Barrientes stated that when the children first entered into the Department's care, they were malnourished and had bug bites on their arms and legs. Both Todd and Kim had "bronchitis and impetigo[.]" Barrientes testified that Kim had a condition she described as "bottle rot" in her teeth that required corrective surgery, resulting in the removal of one tooth and caps placed on the four others. Todd was diagnosed with pulmonary issues. Barrientes stated that it took months, several doctors' appointments, nebulizers, and medications to stabilize Todd to where he was not always congested. According to Barrientes, when Todd entered the Department's care, the foster mother reported that he slept "up to 19 hours a day[,]" but he has since adapted to a regular sleep schedule. Additionally, both children would only eat Cheerios, but they are now eating healthy food and have a balanced

---

not" after using the restroom. Barrientes stated that she had a discussion with the parents about their hygiene and the children's hygiene.

diet. Barrientes believes that the medical and dental care the children received while in the Department's care helped them develop.

Barrientes testified that the children are thriving in their current placement. She stated that Kim and Todd are "happy and healthy[.]"Initially, Kim had some behavioral issues, but the foster family has worked to correct her behavior and teach her the appropriate way to act. According to Barrientes, any fictive kin placements were unacceptable either because of age, drug problems, criminal histories, or history with the Department.

Barrientes believed returning the children to Mother and Father would "significantly impair them." She voiced her concern that Todd's pulmonary issues would worsen, and Kim's teeth would deteriorate in the parent's care. She also stated that Kim has expressed her desire not to be alone with Mother and Father.

Barrientes testified that she had concerns during her most recent visit to the parents' home. Barrientes noted that Todd's room had a mushy ceiling from a water leak and that Mother's brother stayed in Kim's room after being released from the psychiatric ward. Barrientes could not verify if Mother's brother was still in the home. She described the home as having piles of clothes, no child proof locks on cabinets containing cleaning chemicals, and tools and an old stove on the front porch.

10

Barrientes agreed that the parents have made progress, including getting better housing, stable employment, and attending parenting and substance abuse classes.

Victor Love testified that he is a licensed marriage and family counselor, chemical dependency counselor, and sex offender treatment provider. Love stated that, at the Department's direction, he provided counseling services to both Mother, Father, and their children during the pendency of this case. Love described the sessions as typically lasting an hour and covering a range of topics including "parenting issues, how to interact with their children, how to improve their lives, budgeting, healthy home environment, [and] substance abuse[.]"

Love described Father as cooperative and forthcoming in his therapy sessions. Father told Love that he had a substance abuse problem but was "determined to remain abstinent."[6] Love testified that in his practice he has witnessed clients actively using drugs and that some people, especially in the case of methamphetamine use, display certain characteristics such as facial sores from picking their face, elevated body movements, or twitching. In addition, there may be emotional and social signs such as fights with significant others, consistently being

---

[6] Love confirmed his awareness that Father had tested positive for methamphetamines during the pendency of this case. Additionally, Love stated that Father paid for his own testing during the pendency of this case and that one of the tests was positive, although Father continued to deny drug use.

late or missing appointments, loss of employment or frequent interactions with law enforcement. Love stated that Father did not display any of these indications of drug use. His testimony indicated that Father was open to listening in therapy, always on time, never missed an appointment, and appeared to have stability. Love also noted that Mother did not display any indicators that she used drugs during his time with the family. He admitted that he could not "know for certain" that Mother and Father were not using drugs. Love stated that some hair follicle samples could date back a year based on the particular follicle and the part of the body from where the hair was removed. Love testified that methamphetamine is "very powerful[,] . . . very addictive" and is a hard drug to stop. He stated that it is devastating for a child to be exposed to methamphetamine use, and it can lead to a child being neglected or even physically abused.

Love stated that Father gets along with his children and they have affection for him. Love testified that Mother is happy to see her children. According to Love, he was part of six visitations with Mother, Father, and the children. He described the children as excited to see the parents and vice versa. Love indicated that based on his observations of Mother and Father, he would not have a concern about their children's safety in their home. It concerned Love that Father continued testing positive for drugs. Love testified that he told Mother to not allow any contact

between Maternal Grandmother and the children and was concerned that Mother still allowed the children to be around Maternal Grandmother.

Love noted Father and Mother's hygiene issues at the start of their meetings. Love described Mother and Father as having an offensive odor and wearing soiled clothing. Love stated that although both parents have improved their hygiene, "there's still some improvement left to make towards that."

Mother testified that she had used drugs since she was twelve years old. She stated that she used methamphetamines for the first time at the age of eighteen and Father introduced her to that drug. Mother admitted to being a daily user of methamphetamines and continued to use drugs after her children's births. Mother testified that she "sanitized" herself after taking methamphetamines before she touched her children.

> First[,] I would soap and water my hands and then I'd take hand sanitizer. I mean, I even tasted it. It's nasty. I'd sanitize my lips. I'd sanitize my face and I'd sanitize my arms. . . . I would change outfits.

Mother believed she took "proper precautions" to protect her children from transfer of the drug. Mother said that after taking drug classes, she now knows that it was wrong. She stated that she knew she was harming her children and that she is not "looking back." Mother testified that although she and Father used daily, they did not use together so they could each take care of the children. Mother stated that

13

Maternal Grandmother told her she used methamphetamine, but Mother did not know the time period. Mother testified that after Father went to jail and stopped using drugs, she persuaded him to start using methamphetamines again after "two weeks." Mother stated that she has learned how to deal with her "triggers" through Narcotics Anonymous. She also said that counseling, both individual and family, has helped with her relationship and communication.

Mother stated that only she and Father live in their current home. According to Mother, they no longer live in the house that caused the children's removal. Mother testified that they found a home with three bedrooms, keep no pets, and only she and Father live in the home. She denied that the house was in the condition described by Department witnesses. Mother stated that on the day of the removal, the scattered clothing was the result of several days of clean laundry that Kim had strewn around the house. Mother stated that several dogs were living in the house, and although the dogs were paper trained, there was not enough paper for all the dogs and poor lighting caused her not to see all the dog feces. She also blamed her allergies for the reason she could not smell the odor in the house. Mother stated she did not believe her house was dangerous for her children.

Mother discussed her family and confirmed that her brother was suicidal and recently released from a psychiatric hospital. Mother stated that he no longer lives

14

with her. Mother confirmed that she maintained a relationship with Maternal Grandmother and saw her once a week. Mother testified that she sees no reason Maternal Grandmother should not be around her children but would have Maternal Grandmother drug tested if she wanted to visit the children. Mother also stated that she did not believe Father was using drugs, despite his positive drug tests. She added that Father would be willing to go to rehab if it was made a condition to getting their children back.

Mother admitted that the children have progressed while in foster care, and that they are happy and well-dressed. Mother said she planned to keep Kim enrolled in ballet if she is returned. She believed that Kim was making progress when she was in their care. Mother stated that she is aware of Todd's pulmonary issues and that she does not smoke, but Father is trying to "cut down to shorties and lights." Mother stated that the Department told them that smoking outside was better than smoking in the house. According to Mother, both children are ecstatic to see Mother and Father during visitation.

Father testified that he rarely drinks alcohol, but that he was a daily user of marijuana until he switched to methamphetamines about six years earlier. His methamphetamine habit cost him about $20 per week. Father stated that he has not used since July 2018, and he did not know why his drug tests continued to be positive

during the pendency of this case. According to Father, he currently does not use drugs and is not around people who do. Father admitted that he and Mother used methamphetamine when the children lived with them. Father stated that both he and Mother were distracted by the drugs but argued that he still watched his children, even while high. But he also agreed that it was dangerous to care for his children while high on drugs. Since his children's removal, he attended drug counseling classes and Narcotics Anonymous meetings up to three times a week. He only stopped attending Narcotics Anonymous meetings when the building shut down and traveling to other meetings caused a financial burden. Father admitted that he still smoked cigarettes and acknowledged that Todd cannot be around cigarette smoke. Father stated he would quit "cold turkey" if the children were returned to them.

Father confirmed that the unsanitary condition of his home when the children were removed was due to drug use. Father testified that he did not remember the dirty dishes but stated there was feces throughout the home. He acknowledged there were piles of clothes throughout the home and agreed that no one took responsibility for cleaning.

Father stated that he is currently working at Sonic and making eleven dollars per hour, working "32-36 hours" per week. Father stated that he made significant

changes since his children's removal in July 2018. He testified the removal "opened my eyes."

> I've been sober, I've gotten a vehicle, I have gotten my own - - I've gotten a raise, not to mention a promotion. I've also gotten my own house. I've done a lot better on my outlook at life and I completed almost every task that's been thrown at me.

Father stated he has been taking parenting classes, substance abuse classes and participated in counseling with Mother. He believed the classes helped him communicate better as a parent, in his relationship with Mother, and to avoid triggers for his substance abuse. He stated if his children are returned, he planned to enroll his daughter in advanced classes and spend more time with his son. He does not want to miss any more time with his children.

After the bench trial, the trial court terminated Mother's and Father's parent-child relationship with Kim and Todd pursuant to subsections 161.001(b)(1)(D), (E) and further found that such termination was in the best interest of the children. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (2). Mother and Father timely appealed.

## II. Standard of Review

In parental rights termination cases, the standard of proof required at trial is clear and convincing evidence. *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014) (citing *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980)). The no-evidence standard typically

employed in a legal sufficiency review does not adequately protect the parent's constitutional interests in a termination case. *See In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Legal sufficiency in a parental termination case is not satisfied by the traditional standard of anything more than a scintilla of evidence. *Id.* at 264–65. A legal sufficiency review in parental termination cases requires us to determine "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction" that the grounds for termination were proven. *Id.* at 265–66; *see also* Tex. Fam. Code Ann. § 101.007. We examine all of the evidence in the light most favorable to the finding to ascertain whether a reasonable trier of fact could have formed a firm belief its finding was true. *See In re J.F.C.,* 96 S.W.3d at 266; *see also In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). We assume disputed facts were resolved by the factfinder in favor of its finding and disregard evidence a reasonable factfinder could have disbelieved. *In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d at 266. If, after review, we determine no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, we must conclude the evidence is legally insufficient. *In re J.O.A.*, 283 S.W.3d at 344–45; *In re J.F.C.*, 96 S.W.3d at 266.

In a factual sufficiency review, "a court of appeals must give due consideration to evidence that the factfinder could reasonably have found to be clear

and convincing." *In re J.F.C.*, 96 S.W.3d at 266 (citing *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). In examining factual sufficiency, we will consider whether disputed evidence is such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. *Id.* The evidence is factually insufficient, if, "in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction[.]" *Id.* (citation omitted).

### III. Termination under Subsections 161.001(b)(1)(D) and (E)

Mother and Father argue the evidence was legally and factually insufficient to support termination under subsections 161.001(b)(1)(D) and (E). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). To involuntarily terminate a parent's rights, a trial court is required to make two findings. *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). First, a parent must have committed a prohibited act under section 161.001 of the Texas Family Code, and second, termination of the parent's rights must be in the child's best interest. *Id.*; *see also* Tex. Fam. Code Ann. § 161.001(b)(1), (2) (listing necessary requirements to terminate parental rights). To support a termination, only one predicate finding under section 161.001(b) is necessary when there is also a finding by the trial court that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (citations omitted).

19

Subsection D permits the termination of a parent's rights if the trier of fact finds by clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[.]" Tex. Fam. Code Ann. § 161.001(b)(1)(D). Subsection E permits the termination of a parent's rights if the trier of fact finds by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]" *Id.* § 161.001(b)(1)(E).

"Endangerment under subsection (D) arises from a child's environment and a parent's disregard for the potential for danger created by the environment." *In re I.V.H.*, No. 01-19-00281-CV, 2019 WL 4677363, at *5 (Tex. App.—Houston [1st Dist.] Sept. 26, 2019, pet. denied) (mem. op.) (citing *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied)). Subsection D's focus is the child's environment; however, parental conduct may create an endangering environment. *Id.* (citing *In re M.T.W.*, No. 01-11-00162-CV, 2011 WL 6938542, at *12 (Tex. App.—Houston [1st Dist.] Dec. 29, 2011, no pet.) (mem. op.)). Under subsection D, parental rights may be terminated based on a parent's single act or

omission. *In re A.B.*, 125 S.W.3d 769, 776 (Tex. App.—Texarkana 2003, pet. denied).

A finding under subsection E can be "evidenced not only by the parent's acts, but also by the parent's omissions or failures to act." *In re S.K.*, 198 S.W.3d 899, 902 (Tex. App.—Dallas 2006, pet. denied) (citation omitted). "Endangerment under subsection (E) arises when a parent's course of conduct jeopardizes the child's emotional or physical health." *In re I.V.H.*, 2019 WL 4677363, at *5 (citing *In re A.J.H.*, No. 01-18-00245-CV, 2019 WL 190050, at *7 (Tex. App.—Houston [1st Dist.] Jan. 15, 2019, no pet.) (mem. op.)). Termination under subsection E requires more than a single act or omission and "a 'voluntary, deliberate, and conscious course of conduct by the parent is required.'" *In re L.E.S.*, 471 S.W.3d 915, 923 (Tex. App.—Texarkana 2015, no pet.) (quoting *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.)). An inference of danger to a child's well-being may come from parental misconduct. *See Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re K.P.*, 498 S.W.3d 157, 171 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). "A parent's past endangering conduct may create an inference that the parent's past conduct may recur and further jeopardize a child's present or future physical or emotional well-being." *In the Interest of M.M.M.*, No. 01-17-00980-CV, 2018 WL

21

1954178, at *10 (Tex. App.—Houston [1st Dist.] Apr. 26, 2018, pet. denied) (mem. op.) (citing *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.)).

Since evidence of statutory grounds D and E is often interrelated, we may consolidate our review of the evidence supporting these grounds. *See In re M.Y.G.*, 423 S.W.3d 504, 510 (Tex. App.—Amarillo 2014, no pet.). "Both subsections D and E of section 161.001(1) use the term 'endanger.'" *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (addressing previous version of the statute). "'To endanger' means to expose a child to loss or injury or to jeopardize a child's emotional or physical health." *Id.* (citations omitted). In examining endangerment under subsection D, we look to the child's environment, including when a parent is aware of the danger and "consciously disregards[]" the danger or conduct by others that creates an environment that endangers the child's emotional or physical well-being. *Id.* (citations omitted). This inquiry considers the child's environment before he was in custody of the Department. *Id.* "Under subsection E, however, courts may consider conduct both before and after the Department removed the child from the home." *Id.* (citations omitted). "It is not necessary that the parent's conduct be directed at the child or that the child actually be injured; rather, a child is endangered when the environment or the parent's course of conduct creates a potential for danger which the parent is aware of but disregards."

22

*In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (citations omitted).

**A. Mother**

In this case, testimony established that at the time of the children's removal from Mother's care, they were living in filthy conditions, including mold and animal feces. The children were covered in dirt, had bug bites, and played in a yard covered in garbage and scrap iron. After removal, the children were diagnosed with impetigo and bronchitis, and Todd was diagnosed with food allergies and pulmonary issues. Mother was an admitted smoker and drug abuser. Testimony also established that for weeks after removal the children would only eat cereal and Todd would sleep for upwards of nineteen hours a day.

Mother admitted that she regularly used methamphetamine both before and after she had children, telling the trial court the detailed procedure she used to "sanitize" herself after taking methamphetamine but before handling her very young children. Although Mother denied using drugs after the children's removal, she continued to test positive for drugs for several months. Mother's only explanation was that the drug test was done on hair that did not grow as fast as others. Evidence also showed that Mother continued associating with known drug abusers, although Mother denied any knowledge of their drug use. When presented with evidence of

23

Father's continued positive drug tests, Mother only responded that Father was not doing drugs, but she could not explain the positive results. When questioned about Maternal Grandmother's drug use, Mother stated that she did not know Maternal Grandmother was a drug abuser. Mother remained adamant that she intended to maintain a relationship with Maternal Grandmother but would require Maternal Grandmother to have a drug test before she could be around the children. Additionally, Mother testified that she allowed her brother, recently released from a psychiatric ward, to stay in her house, although she provided contradicting information about whether her brother slept in Kim's room after Kim's removal.

Although Mother stated that she and Father now live in a better home, testimony at trial established that the new home had issues including a water leak in the ceiling of Todd's room, lack of child proof locks on the cabinets containing dangerous cleaning chemicals, and outdoor hazards such as old appliances on the porch.

There is substantial evidence Mother endangered her children by knowingly placing them or allowing them to remain in dangerous conditions in violation of subsections 161.001(b)(1)(D) and (E). While testimony established that Mother and Father were very cooperative and that Mother had made strides toward reunification by getting stable employment and taking her required substance abuse classes,

24

counseling, and parenting classes, "even strong evidence of improvement cannot conclusively negate past history." *See In re P.R.W.*, 493 S.W.3d 738, 744 (Tex. App.—Corpus Christi 2016, no pet.) (mem. op.) (citations omitted). Mother admitted to using drugs while the children were in her care and continued to maintain relationships with individuals, including Maternal Grandmother and Father, despite positive drug test results and testimony that Maternal Grandmother was a known drug user. *See In re J.O.A.*, 283 S.W.3d at 346 ("While the recent improvements made [by father] are significant, evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices."); *In re J.E.*, No. 07-12-00449-CV, 2013 WL 441093, at *4 (Tex. App.—Amarillo Feb. 5, 2013, no pet.) (mem. op.) (determining that Mother's association with drug users and her "pattern of drug use" was sufficient to demonstrate endangerment).

Additionally, evidence established that the children were living in filthy conditions with animal feces. Mother offered an excuse that the lighting in the house concealed the conditions, and allergies prevented her from smelling the odors. Evidence of the unsanitary conditions, such as dog feces, dirty dishes, and the parent's unacceptable excuses for the conditions, are proof of endangerment. *See In re A.L.*, 545 S.W.3d 138, 146–47 (Tex. App.—El Paso 2017, no pet.); *In re D.M.*,

25

452 S.W.3d 462, 470–71 (Tex. App.—San Antonio 2014, no pet.) (evidence of unsanitary conditions and the child's condition including thin, dirty and covered in bug bites sufficient to show endangerment); *In re A.T.*, 406 S.W.3d 365, 371 (Tex. App.—Dallas 2013, pet. denied) (citation omitted) ("Unsanitary conditions can qualify as surroundings that endanger a child.").

The evidence was legally and factually sufficient to show that Mother endangered the minor children's "physical and emotional well-being" as required under subsections 161.001(b)(1)(D) and (E). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). Therefore, in viewing the evidence in the light most favorable to the trial court's decision, we hold there was clear and convincing evidence to terminate her parent-child relationship under subsections 161.001(b)(1)(D) and (E). *See id.; In re J.O.A.,* 283 S.W.3d at 344. Additionally, we conclude that in viewing all the evidence both favorable and unfavorable to the trial court's decision, the evidence is not so contrary that a reasonable fact finder could not form a firm belief or conviction that Mother endangered her children as required by subsections 161.001(b)(1)(D) and (E). *See In re J.F.C.*, 96 S.W.3d at 266. We conclude that that the evidence is both legally and factually sufficient to terminate Mother's parental

rights under subsections 161.001(b)(1)(D) and (E). We overrule Mother's first and second issues.[7]

## B. Father

The evidence at trial established that Father has been abusing various drugs since he was a teenager, with his drug of choice being methamphetamine for the last six years. Father admitted that he and Mother used methamphetamine while caring for his children and stated that despite being high, he was "watching" his children. Father denied continued drug use after his children's removal, although the evidence at trial established he continued to test positive for methamphetamine through the pendency of these proceedings. Father could not explain his positive test results. *See In re J.S.*, 584 S.W.3d 622, 636 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (citations omitted) ("Texas courts have repeatedly held that a parent's illegal drug usage, even after removal of the child from the home and during the pendency of termination proceedings, may establish an endangering course of conduct because it 'creates the possibility that the parent will be impaired or imprisoned and thus incapable of parenting.'"); *In re S.K.A.*, 236 S.W.3d 875, 901 (Tex. App.—

_____

[7] Although Mother, in her third issue, challenges the termination of her parental rights as legally and factually insufficient to show that she failed to complete her service plan, we will not address this issue on appeal as the trial court did not terminate her parental rights under subsection (O). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(O).

27

Texarkana 2007, pet. denied) ("Continued narcotic use after the children's removal is conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct."); *see also Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 254 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (explaining that in an endangerment evaluation, a trial court is not required to discount a parent's long history of drug abuse, even if the parent claims they have stopped using before trial); *In re D.K.J.J.*, No. 01-18-01081-CV, 2019 WL 2455623, at *12 (Tex. App.—Houston [1st Dist.] June 13, 2019, pet. denied) (mem. op.) (noting that the trial court was not required to believe father's testimony that he had stopped using drugs and that a positive drug test was the result of a "false positive[]").

Father also admitted that descriptions of their home at the time of the removal were accurate and that no one took responsibility for cleaning the home. "Unsanitary conditions can qualify as surroundings that endanger a child." *In re C.L.C.*, 119 S.W.3d 382, 392 (Tex. App.—Tyler 2003, no pet.) (citations omitted); *see also In re M.R.H.*, No. 07-15-00089-CV, 2015 WL 3463025, at *3 (Tex. App.—Amarillo May 26, 2015, pet. denied) (mem. op.) (explaining that evidence that the parent's home was covered in dog feces and full of trash was sufficient for the trial court to conclude the parent endangered the child by placing the child in "endangering

28

surroundings"). Additionally, testimony established that despite improvement in Mother and Father's new home, significant problems remained to be addressed for the safety of the children, including leaks in the roof or plumbing causing mushy ceilings in the child's room and lack of child proofing throughout. *See In re W.R.E.*, 167 S.W.3d 636, 642 (Tex. App.—Dallas 2005, pet. denied) (concluding that evidence of continued neglect and unsanitary conditions after removal were sufficient to show that father engaged in endangering conduct).

Testimony also established that Mother and Father maintained relationships with active drug abusers. *See In re K.K.D.B.*, No. 14-17-00302-CV, 2017 WL 4440546, at *9 (Tex. App.—Houston [14th Dist.] Oct. 5, 2017, pet. denied) (mem. op.) ("A parent endangers [his] child by accepting endangering conduct of other people.").

Viewing the evidence in the light most favorable to the trial court's decision, we conclude there is clear and convincing evidence to show that Father engaged in conduct that endangered the physical and emotional well-being of Kim and Todd. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). We also conclude that viewing all the evidence, any disputed evidence is not so overwhelming that a fact finder could not have formed a firm belief or conviction that Father endangered his children under subsection (D) and (E). *In re C.V.L.,* 591 S.W.3d 734, 749 (Tex. App.—Dallas

2019, no pet.) (citing *In re N.T.*, 474 S.W.3d 465, 475 (Tex. App.—Dallas 2015, no pet.). We overrule Father's sole issue on appeal.[8]

## IV. Best Interest

In her final issue, Mother argues that termination of the parent-child relationship is not in her children's best interest. "[T]here is a strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *see also* Tex. Fam. Code Ann. § 153.131(b). In reviewing whether termination is in a child's best interest, we consider a non-exhaustive list of factors: (1) desires of the child; (2) emotional and physical needs of the child now and in the future; (3) emotional and physical danger to the child now and in the future; (4) parental abilities of the individuals seeking custody; (5) programs available to assist these individuals to promote the best interest of the child; (6) plans for the child by these individuals or by the agency seeking custody; (7) stability of the home or proposed placement; (8) acts or omissions of the parent which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). "[T]he prompt and permanent placement of the child in a safe

---

[8] Father does not challenge the trial court's finding as to best interest on appeal.

environment is also presumed to be in the child's best interest." *In re F.A.B.*, No. 05-14-01277-CV, 2015 WL 631165, at \*3 (Tex. App.—Dallas Feb. 13, 2015, pet. denied) (mem. op.) (citing Tex. Fam. Code Ann. § 263.307(a)).

The list is not exhaustive, but simply indicates considerations that have been or could be pertinent. *Holley*, 544 S.W.2d at 372. However, the best-interest determination neither requires proof of any unique set of factors nor limits proof to any specific factors. *In re D.M.,* 58 S.W.3d at 814 (citing *Holley,* 544 S.W.2d at 371–72). There is no requirement that the party seeking termination prove all nine factors. *See In re C.H.*, 89 S.W.3d at 27. Undisputed evidence relating to one single factor may be adequate in a particular situation to support a finding that termination is in the best interest of the child. *Yonko v. Dep't of Family & Protective Servs.*, 196 S.W.3d 236, 243 (Tex. App.—Houston [1st Dist.] 2006, no pet.). Evidence supporting the termination of parental rights is also probative of best interest. *In re C.H.*, 89 S.W.3d at 28. "A parent's inability to provide adequate care for her children, unstable lifestyle, lack of a home and income, lack of parenting skills, and poor judgment may be considered when looking at the children's best interest." *In re J.D.*, 436 S.W.3d 105, 119 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (citing *In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.). Additionally, evidence of a parent's "recent turnaround" is not determinative in best interest

sufficiency review. *See In re J.J.W.*, No. 14-18-00985-CV, 2019 WL 1827591, at \*9 (Tex. App.—Houston [14th Dist.] Apr. 25, 2019, pet. denied) (mem. op.).

Evidence at trial established that despite Mother and Father's improved housing, issues remained with the condition of the home and the parents' hygiene. Mother testified she was a stay at home mother before the Department removed her children, and she had recently reentered the workforce, but only obtained that employment shortly before the trial. Testimony also showed that Mother and Father moved around significantly during the pendency of this case, including at one time living in their car.

While there was testimony that Mother was extremely cooperative with the Department and substantially completed her service plan, Mother continued making poor decisions that would negatively impact Kim and Todd's safety and emotional and physical welfare. Mother continued exhibiting questionable decision-making regarding her social circle, refusing to disassociate herself from Father, Maternal Grandmother or her brothers, and making excuses for their behavior. Mother's testimony that she believed Father was not using drugs, despite positive drug tests throughout the duration of this case, demonstrates that she failed to put her children's safety and needs above her own. Additionally, testimony established that Mother refused to disassociate herself from Maternal Grandmother, a known drug abuser,

according to the Department. Mother denied knowing if Maternal Grandmother was on drugs but offered that she would require a drug test before allowing Maternal Grandmother to be around the children. After the children were removed, Mother also allowed her brother, recently released from a psychiatric facility, to stay in her daughter's room. Mother discounted her association with her brother by stating it was a temporary situation. *See In re M.L.G.J.*, No. 14-14-00800-CV, 2015 WL 1402652, at *17 (Tex. App.—Houston [14th Dist.] Mar. 24, 2015, no pet.) (mem. op.) ("A court should consider whether there is a history of substance abuse by the [c]hildren's family or others who have access to their home in determining the best interest of the [c]hildren.").

Testimony at trial showed the children arrived in the Department's care suffering from physical ailments and health concerns, such as dental issues, bug bites, bronchitis, and impetigo. Medical professionals also diagnosed Todd with food allergies and pulmonary issues. Testimony established that Kim and Todd are happy and healthy in their foster parents' home, want reassurances that they will be returned to their foster parent's after visitation with Mother and Father, and the foster parents want to adopt them. Kim and Todd each have their own room, and there are relatives close by who can help and provide support to the children and the foster parents. Kim is an advanced child and has been able to explore extracurricular

33

activities such a ballet while in the care of her foster parents. We find the evidence both legally and factually sufficient for the trial court to have found by clear and convincing evidence that it was in the children's best interest to terminate Mother's parental rights to both children. We overrule Mother's final issue.

## V. Conclusion

Having overruled all of Mother and Father's issues on appeal, we affirm the judgment of the trial court terminating the parental rights of Mother and Father in and to the minor children Kim and Todd.

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on March 4, 2020
Opinion Delivered April 9, 2020

Before McKeithen, C.J., Kreger and Johnson, JJ.