

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-20-00396-CV

———————————————————

## IN THE INTEREST OF R.H., F.V., M.V., AND P.H., CHILDREN

---

On Appeal from the 233rd District Court
Tarrant County, Texas
Trial Court No. 233-679089-20

---

Before Kerr, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

R.H.H. (Mother) and N.V.C. (Father) appeal from the trial court's order terminating their parental rights to four of their children—R.H. (Ross), F.V. (Finn), M.V. (Macy), and P.H. (Penny)—and appointing the Department of Family and Protective Services as the children's permanent managing conservator.[1] In this ultra-accelerated appeal,[2] Mother and Father raise nine issues. We will affirm the judgment as modified.

## I. Background

Mother and Father have seven children: C.V. (Cora) M.V. (Myra), A.V. (Anne), Ross, Finn, Macy, and Penny, and they had been involved with the Department for a decade by the time of the 2020 trial in this case. Before the events giving rise to this case, the Department had investigated Mother and Father numerous times for neglectful supervision, physical neglect, physical abuse, sexual abuse, and medical neglect. The Department had also investigated allegations that Myra and Anne were sex-trafficking victims.

---

[1] We refer to the children using aliases and to other family members by their relationship to the children. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2] *See* Tex. R. Jud. Admin. 6.2(a), *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. F app. (requiring appellate court to dispose of appeal from judgment terminating parental rights, so far as reasonably possible, within 180 days after notice of appeal is filed).

In June 2019, the Department removed all but Cora, who was 17 years old at the time. The investigation leading to the children's removal started six months earlier when the Department received reports that then-14-year-old Anne was skipping school and was involved with a known sex trafficker; that some of the children had "an issue with lice"; and that the home was unsanitary.

## A. Investigation and removal

According to Adrianne Brown, a Department investigator, the Department commenced the investigation over concerns about the children's unsafe home conditions and about Anne's being a sex-trafficking victim. During Brown's initial visit to the family's home, she observed that the floors had mud and dirt on them and that there was a "very strong odor of . . . human urine" throughout the home. The kitchen counters were covered in food and dishes, and there were "tons of bugs and flies." Brown checked for bed bugs and found none, but she observed that the mattresses and sheets were very dirty.

Brown was alarmed about the home's condition because "[c]hildren shouldn't be living in an environment like [that] . . . especially with [Penny's] having health conditions. I was worried that they would get sick from the home conditions." But when Brown discussed these apprehensions with Mother, Mother "didn't seem very concerned" and could not understand why Brown was concerned.

Brown observed that then-five-year-old Penny was "very tiny" and underweight. Her clothes were tattered and dirty, and her fingernails were "very

3

black." She was unbathed, and her hair was very messy and looked like it had not been combed in a long time. Brown described Penny as not having any muscle and her limbs as "just kind of bone and skin." When Brown voiced these concerns, Mother responded that Penny's size was a result of her medical issues. Brown testified that Penny's doctors were concerned that Mother was not "following through" with Penny's medical care and that Mother was having a hard time following medical recommendations.

Brown was also troubled because Penny needs round-the-clock supervision and care because she cannot eat and drink like a normal child. Brown admitted that she did not know Penny's medical diagnosis but testified that the child is nonmobile, nonverbal, and cannot care for herself. When Brown visited the home, Penny was alone in a room with the door closed and was "kind of half hanging off" a mattress on the floor.

Brown observed that Ross, Finn, and Macy were very dirty, "just kind of ran wherever they wanted to," and "weren't being watched or supervised." During Brown's visit, Brown talked to then-ten-year-old Ross, who had a "very strong, foul body odor." Ross appeared "intellectually delayed" and was thus unable to do a complete interview with Brown and could not understand many of her questions. Like Penny, Ross wore clothes that were tattered and dirty, and his fingernails were very dirty. Brown observed that then-eight-year-old twins Finn's and Macy's conditions were the same—foul body odor; dirty, tattered clothes; and dirty fingernails. Brown

described the body odor as "if they hadn't bathed in a very long time" and stated that "[i]t was to the point where I was getting sick interviewing them[,] and I was going to have to leave at one point because I couldn't stay in there any longer with the odor." When Brown addressed the children's conditions with Mother, Mother responded that she could not make the children bathe if they did not want to.

Mother was also unable to supervise the children. During Brown's visit, Brown saw Ross and Finn run in the street toward the nearby Interstate 35 service road, and Brown had to tell Mother to stop them. At one point, one of the children "grabbed an axe and started playing with it while . . . running in and out of the street." Mother saw this and did nothing until Brown prompted her to intervene.

Brown confirmed that the family had a lengthy history with the Department that involved the home's condition; Cora's being sexually abused and reporting it to Mother, who did nothing; Myra's and Anne's not attending school; and Myra's and Anne's being sex-trafficking victims. When Brown spoke to Mother about the possibility that Anne was a sex-trafficking victim, Mother "didn't really believe that that's what was happening" and would say that Anne was "just a runaway."

Brown spoke to Father by telephone about the physical-neglect and sex-trafficking allegations. Father responded that he was "never really home," that childcare was Mother's responsibility, and that he had no idea what was going on at home. When Brown spoke to Anne about Father, Anne "described on numerous occasions that when she would run away, she was afraid to come home because she

5

knew her father would hit her, slap her, and punch her, and that he had done that any time she had come home from running away." Anne also told Brown that she was afraid to come back home because Father would curse at her and call her names.

Based on the concerns that arose during her investigation, Brown referred the case to Family-Based Safety Services (FBSS). Mother and Father agreed to work FBSS services even though the parents thought they were unnecessary.

The FBSS case was open for about six months when the Department received a report in late May 2019 concerning the parents' physical and medical neglect of Penny. The Department and the FBSS caseworker recommended that Penny be evaluated at Cook Children's Medical Center due to her weight loss. Justin Green, another Department investigator, met Penny at the hospital and spoke with hospital staff, who were worried that the now-six-year-old child was failing to thrive and was being physically neglected. When Penny arrived at the hospital, her hair was severely matted; she had a "severe lice infestation"; and she had fungus on two of her toes. By the time Green arrived, hospital staff "had already tried to treat the lice infestation . . . and had brushed and cut some of her hair to try to treat the lice." Green observed that Penny was severely underweight and malnourished.

As part of his investigation, Green spoke with both parents about Penny's failure to thrive and the lice infestation. Even though Penny weighed a mere 25 pounds, her parents seemed oblivious that her weight was an issue or that she was

failing to thrive. As for the lice, Mother told Green that she was planning to take Penny to get a haircut to treat the lice.

Green was surprised that Mother and Father were not concerned about Penny's weight because of the family's Department-related history, which included Penny's being diagnosed with failure to thrive at three months old. Since then, the Department had opened cases because it was concerned that Penny was malnourished and that all the children were being physically neglected.

Based on Green's investigation regarding Penny, it appeared to Green that Mother and Father were not making progress regarding any of the children during the FBSS case, even though the case had been going on for six months. After Green's investigation, "[t]he decision for removal was put forth through FBSS," which "had [a] consistent history with the family, . . . had consistent issues and concerns with the physical neglect of the children, lack of adequate supervision of the children, the concerns for the -- sex trafficking of [Myra] and [Anne]."

In June 2019, the Department sued for conservatorship of Myra, Anne, Ross, Finn, Macy, and Penny and to terminate Mother's and Father's parental rights to them. The children were removed from the parents, and the trial court signed an order appointing the Department as the children's temporary managing conservator.

## B. The trial

The case was tried to the bench over two days in October and November 2020.[3] At the start of trial, the Department announced that it intended to "nonsuit as to [Myra and Anne]" and that it would elicit testimony about why the Department believed that a nonsuit was in the girls' best interest.

Brown and Green testified regarding the Department's investigation leading to the children's removal. The trial court also heard testimony from Maribel Leal (a Department local permanency specialist who had worked on the case since October 2019); Julie O'Brien (the case's permanency supervisor); Penny's foster mother; and Father. Mother did not testify.

### i. *Myra and Anne*

Myra turned 17 during the trial, and Anne turned 16 just after the trial. The Department believed that both girls were sex-trafficking victims. At one point, both girls had been associating with a rumored trafficker who had admitted to sleeping in a bed with the two girls. The Department suspected that he was "prostituting the girls." When the Department confronted Mother with its suspicions, she was unconcerned about the girls' association with the man, as well as their association with another

---

[3]In April 2020, the Department timely moved the trial court to retain jurisdiction for an additional six months so that Mother and Father could complete the service-plan requirements necessary for the children's return. *See* Tex. Fam. Code Ann. §§ 263.401, .403(a-1). The trial court granted the motion on May 18, 2020, and extended the case's dismissal date to November 13, 2020. The trial commenced on October 2, 2020.

suspected sex trafficker. Father claimed that he was not aware of the sex-trafficking concerns until the first day of trial.

Both girls had a history of running away from home. Mother and Father had no control over them and admitted to Leal that the girls would just come and go. Father had kicked them out of the house several times over the past few years. During the 17 months the girls were in the Department's care, they ran away several times and were last in the Department's care in April 2020. At the time of trial, neither the Department nor Father knew where the girls were. Leal testified that Myra and Anne did not trust the Department and that they refused to meet with her because they feared she would put them back into foster care.

Traffick911—an advocacy group that works with sex-trafficking victims and provides them with medical services, counseling, help, and assistance—had been working with the girls for years and believed that they were human-trafficking victims. The girls had a close relationship with the organization, but since their removal by the Department, the girls had refused to meet with anyone from Traffick911 because they feared that the organization would turn them over to the Department, which would put them back into foster care. Traffick911 believed that the Department's involvement was "keeping [the girls] on the run" and was preventing Traffick911 from being able to work with the girls and provide them with services. Traffick911 urged the Department to dismiss the termination case regarding Myra and Anne because Traffick911 believed that the girls would be willing to engage with the

organization again and get the services and help they needed. Both Leal and O'Brien thus believed that it would be in the girls' best interest for the Department to dismiss them from the case.

Based on Mother's and Father's attitudes toward Myra's and Anne's behavior, Leal was concerned that Macy—who herself was showing signs of having been sexually abused—might engage in the same behavior as her older sisters. Leal further opined that she was concerned that the parents' lack of concern or awareness that Myra and Anne were trafficking victims put all the children at risk of being trafficked.

### ii. *Ross, Finn, and Macy*

At the time of trial, Ross was 12 years old, and Finn and Macy were 10 years old.

Leal testified that Ross was doing well. He was in the seventh grade and was attending class in person. Leal described Ross—who is in the special-education program at school—as "verbal" but "not able to have direct conversation with you." Ross has hearing issues and thus has a cochlear implant. Ross is now potty trained but still has bedwetting problems. He takes sleep medication and receives speech, occupational, physical, and behavioral therapy.

Just before trial, Ross had moved to a new foster home and was not placed with any of his siblings. Ross had earlier been placed with Macy, but he had started behaving inappropriately with her and had developed behavioral problems. Ross's behavior at home—which Leal described as "constantly in everyone's face and

10

want[ing] all the attention"—prevented Macy from getting the attention that she needed. But after Ross moved to a new foster home, Macy was able to get individual attention, and "she's loving that."

Although Macy was "doing really well" in her foster home, she struggles with her hygiene routine. Her foster mother makes sure that Macy stays clean. Macy is medicated for depression and receives "regular" and occupational therapy. Macy also showed signs of having been sexually abused before she came into care. Macy's foster mother wants to adopt her.

Macy's twin brother Finn was not in an adoption-motivated home but was in a home that deals with special-needs children. He is in special-education classes, receives behavioral counseling, and receives speech, physical, and occupational therapy. Finn had been on three mental-health medications but was able to get off of them while he was in the foster home. But he was still taking medication for bedwetting.

Ross and Finn had originally been placed together, but because of problems with that foster home, the brothers had to be separated. The Department's plan is to move Ross and Finn into an adoption-motivated home together.

### iii. *Penny*

Penny's foster mother (Foster Mother)—who before becoming a stay-at-home mom had worked as a pediatric occupational therapist—first met Penny while Penny was in the hospital in June 2019. Both Foster Mother and Leal confirmed Green's

account of Penny's condition at the hospital: her lice-infested hair that was so severely matted that hospital staff had to cut it to treat the infestation; her sallow, yellowish skin; and her extreme malnourishment. At 25 pounds, Penny was the size of a two-year-old. At the hospital, Penny, who is developmentally delayed and nonverbal, did not make much eye contact or "really show any sort of interaction with her surroundings."

Penny has been diagnosed with global developmental delay, failure to thrive, toenail fungus, encephalopathy, severe malnutrition, swallowing dysphagia, and epilepsy. Penny suffers from epileptic seizures, and her swallowing dysphagia inhibits her ability to swallow food. If Penny "attempts to take anything by mouth that is not of an approved thickness or consistency, she can aspirate, which would cause the substance to go into her lung[s] and cause pneumonia." As a result of this condition, Penny is fed through a gastric tube—or G-button—which doctors surgically placed during her hospitalization. Operating, cleaning, and changing the G-button requires special training that Foster Mother received at the hospital before bringing Penny home.

Penny's medical conditions require round-the-clock supervision. She is nonambulatory and has to use a wheelchair as well as other medical equipment such as leg braces, a stander, a hospital bed, a special car seat, and incontinence and feeding supplies. Penny's medical team includes a primary-care physician, an audiologist, an eye specialist, a neurologist, a geneticist, and an endocrinologist.

At the time of trial, Penny was seven years old and had lived with Foster Mother since being released from the hospital nearly 16 months before. During that time, Penny's weight had doubled and her body-mass index was appropriate for her age. Penny had also gained strength, was "able to sit up from a supine position," and could roll "from prone to supine." She had started showing some "precursor skills to crawling," had started making eye contact, and had begun laughing when things were funny and crying when she was in pain, which were emotional reactions that Foster Mother "did not see at the very beginning when she came into [Foster Mother's] care."

Leal testified that Penny is currently healthy, her clothes are always clean, and her hair is always brushed and adorned with a bow. Foster Mother reported that Penny was as happy and healthy as she could be. Foster Mother has a strong bond with Penny, loves her, and wants to continue to be her placement.

Penny is the only foster child in Foster Mother's care. Penny cannot be placed with her siblings because she requires such a high degree of specialized care, which Foster Mother can provide. The children's foster families are able and willing to allow the children to see each other.

### iv. *Mother and Father*

Mother and Father love their children. The children appear to love Father, and Father and the children appear to be bonded.

Mother is a stay-at-home mom and the children's primary caretaker. Father works "all the time" and is at home only in the afternoons. Father has had the same job for 22 years and makes $15 an hour. Father owns the family's home and is willing to buy a larger home if necessary.

According to Mother's psychological evaluation, which was admitted into evidence at trial, Mother has "very limited cognitive skills and is not likely to appropriately make decisions in the best interest of herself and her children," and "[i]t is likely that [she] will need supervision and support with her children and should not be in a decision-making and primary caretaking capacity." Mother's "limited abilities could be addressed with some services, but it is unlikely that her abilities will improve greatly."

The psychologist who examined Mother diagnosed her as "borderline intellectual functioning." Among other things, the psychologist recommended that Mother "participate in community-based services that give her a healthy outlet to talk about her concerns and connect with others"; "participate in parenting skills curriculum and if possible have a parenting mentor to assist her in understanding how to parent effectively"; and "have supervised contact with her children, provided that the contact is not counter-indicated by the child's treatment plan."

Leal believed that Mother was incapable of caring for the children not because of her intellectual abilities but because she lacked the desire and capability to do so.

Father's psychological evaluation, which was also admitted into evidence, states that

> [Father] appears to be dealing with the issues of the CPS case, and is having feelings of mistrust and social alienation, but he does not have the skills to improve the social relationships in his life and may be dealing with the reality that his wife is not able to adequately help him resolve the issues going on in the family. [Father] would likely need substantial support from others in order to have a full-time caregiving role for his children. He has long been focused on the "provider role" and has not been active in the daily parenting of the children, leaving those matters to his wife. He would likely continue to be supportive in any possible capacity for his children, but not well-suited for a daily caregiving role.

The psychologist also diagnosed Father as "borderline intellectual functioning."

According to Leal, Father is not willing to make any changes to his parenting role, and he was unwilling to reach out to family or neighbors for help. Father testified that he and Mother had done everything the Department had asked them to do and that he thinks they are much more capable of taking care of the children than they were before the children's removal. He claimed that he and Mother were willing to do whatever they needed to do to take care of the children, including getting them to medical and therapy appointments and making sure that they are fed. He disagreed with the Department that he and Mother cannot take care of the children.

### v. *The family's history with the Department*

As noted, the family has a lengthy history with the Department, which since 2010 had handled more than 15 "intakes" involving the family. According to O'Brien,

the case's permanency supervisor, the Department had opened more than ten cases involving Myra and Anne.

The first FBSS case involving the family was opened in 2011 and involved concerns about insufficient weight gain and care of Finn and Macy, who were five months old at the time. The next FBSS case was opened in December 2016 based on a referral regarding allegations of physical and medical neglect of Macy. The case remained open for nine months until the Department stopped working with the family because the family had "reached a plateau," and the Department did not feel that it could provide any more services or help for the family. At that time, the Department felt that the children were still at risk and that the family's issues were unresolved. The issues in that case were the same that the Department was working on with the parents in this case—issues the parents still had not addressed, even though by the time of trial, this case had been pending for about 17 months.

According to O'Brien, when the Department was involved with the family in the past, the children would gain weight and the parents would improve the "sanitation and appropriateness of the home," but when the Department "was out of the case" the Department would receive new referrals expressing the same concerns about the family. Based on the Department's involvement and history with the family, O'Brien believed that the children were at substantial risk if Mother's and Father's rights were not terminated because the children's medical and developmental needs would not be met, and the children would not continue to thrive.

**vi.** *The parents' service plans and visits with the children*

When Leal took over the case in October 2019, she thought that the most important services for Mother and Father to complete were improving their parenting skills and engaging with and parenting the children during visits. The parents' service plans included attending visits with the children; undergoing drug testing; completing counseling; maintaining contact with Leal; attending the children's medical appointments; having stable housing; having stable income; and participating in a special parenting class. Additionally, the parents were required to "comply with recommendations from . . . medical professionals, including any support classes or education classes to help manage their children'[s] needs" and to "demonstrate they can provide for their children's medical, emotional, therapeutic, and physical needs during visitations." The trial court had ordered that the parents could have unsupervised visitation in their home if they could "demonstrate they can meet all medical and physical needs of [the children] without assistance from . . . medical or other professional staff during at least four consecutive supervised visits"; "show their ability to brush [Penny]'s teeth, brush her hair, change her diaper, use her wheelchair, do G-button feedings, and work on the occupational therapy and physical therapy goals for [Finn] and [Ross]"; and "demonstrate they have a safe and stable location for the unsupervised visits."

Although the parents satisfied most of the plan's requirements[4]—they tested negative for drugs; attended visits and medical appointments; maintained contact with Leal; maintained safe, stable, and appropriate housing; completed counseling; and Father maintained his job—they failed to demonstrate that they could parent the children and care for their needs.[5] During visits with the children, the parents struggled to interact with and to supervise them; the children were "all over the place sometimes" and would leave the visitation room. Leal would have to prompt the parents to retrieve them, and the parents' engagement and interactions with the children took "a lot of prompting" by Leal. During these supervised visits, the parents were unable to demonstrate that they could care for Penny's needs (brushing her hair and teeth, changing her diaper, and feeding her through the G-button) and thus never progressed to unsupervised visitation.[6] And even though Leal had explained Penny's

---

[4]The Department admitted that for reasons beyond the parents' control, the parents could not complete the parenting and trafficking-awareness classes.

[5]Before the COVID-19 pandemic, Mother and Father attended all the children's medical appointments. The pandemic eventually prevented the parents from attending those appointments, but Leal updated the parents after appointments and gave them notes. The pandemic also caused the suspension of in-person visits with the children for a time, but the parents attended virtual visits until in-person visits resumed.

[6]The parents received G-button training at Cook Children's, but Leal said that the training was unsuccessful. Foster Mother was present during some of the parents' visits with Penny and tried to teach them how to use and care for Penny's G-button. Foster Mother observed that Mother and Father did not seem to retain what she had taught them and "kind of passed off the responsibility onto [Cora, their eldest child,] instead of taking the initiative to do it themselves."

18

swallowing disorder to the parents, during a visit three weeks before trial, the parents tried to rinse Penny's mouth out with water, which concerned Leal because she had warned the parents about the risk that Penny could aspirate.

Leal worked one-on-one with the parents to inform them and to educate them on each of the children's needs. She had hoped that with the one-on-one coaching the parents would become more engaged "in wanting to know about what they could change or do better." But when Leal had asked Mother and Father to explain each child's needs, neither parent was able to fully explain them. Mother, the main caregiver, had neither demonstrated to Leal that she knew what was required on a day-to-day basis to care for the children nor shown any interest in learning.

Leal had no reason to believe that Father "would do anything differently than what he has done in the past, which [was] to be mainly a provider." When questioned at trial regarding each of the children's specific needs, Father was able only to generally describe each child's medical condition and was unable to name their medical providers or describe their medical needs, treatments, and therapies. He admitted that although he had attended visits each week, he had never asked about the children's physical, emotional, and medical needs.

Leal did not believe that Mother has the intellectual capacity or desire to meet her children's specialized needs or that Father can meet those needs. O'Brien described Mother and Father as "borderline functioning" but, like Leal, she thought their inability to meet their children's needs was a combination of unwillingness and

19

lack of capacity. In past cases, Mother and Father had shown that they were unwilling to take care of their children.

Given the Department's extensive history with the family and its concerns about neglectful supervision, Leal did not believe that the Department's concerns had been addressed throughout this latest case, which had lasted nearly two years. During the case, the parents had not demonstrated that they would change the way they parent and supervise the children and had not admitted that their parenting skills could improve. Although Mother and Father love the children and participated in services, they had not progressed enough to address the Department's concerns and to prove that they could meet the children's needs and provide for them.

Leal believed that termination of Mother's and Father's parental rights to the children was in the children's best interest because the parents were unable to meet their children's special needs and were unwilling to make the significant life changes necessary to enable them to take care of their children.

### vii. *The trial court's ruling*

As promised, the Department moved to dismiss the termination case as to Myra and Anne, and the trial court granted the motion. The trial court found by clear and convincing evidence that termination of Mother's and Father's parental rights to Ross, Finn, Macy, and Penny was in the children's best interest and that the Department had established by clear and convincing evidence the conduct grounds under Subsections (D) (endangering environment), (E) (endangering conduct), and

20

(O) (failing to complete service plan). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O), (b)(2). The trial court also found that Mother had failed to prove by a preponderance of the evidence that she was unable to comply with a court-ordered service plan and that despite making a good-faith effort, her failure to comply was not her fault. *See id.* § 161.001(d). The trial court thus terminated Mother's and Father's parental rights to the children and appointed the Department as the children's managing conservator.

## C. Mother and Father appeal

Mother and Father timely filed a notice of appeal and raise nine issues.[7] In their first, second, and sixth issues, they complain that the evidence was legally and factually insufficient to support the trial court's conduct and best-interest findings. In their remaining issues, they complain that the trial court erred by failing to make a finding that Mother and Father were unable to comply with a court-ordered service plan despite making a good-faith effort and that their failure to comply was not their fault (issue three); by failing to give the parents more time to complete their service plan (issue four); by admitting evidence regarding Myra and Anne (issue five); by finding that Father's parental rights should be terminated because he failed to comply with provisions of a court order specifically establishing the actions necessary for Mother

---

[7]In the trial court, Mother and Father each had a court-appointed attorney. On appeal, they are jointly represented by a retained attorney who filed a single brief on their behalf.

to obtain the return of the children under an invalid Family Code section[8] (issue

seven); by admitting into evidence Mother's psychological examination (issue eight);

and by failing to provide Mother with an attorney ad litem (issue nine).

We will address these issues out of order because doing so aids in our

disposition of the appeal.

## II. Appointment of Counsel under Family Code Section 161.003

In their ninth issue, the parents assert that because Mother's psychological

evaluation states that she has limited cognitive skills and is borderline intellectual

functioning, Family Code Section 161.003(b) required the trial court to appoint

Mother an attorney ad litem. *See id.* § 161.003(b). The parents argue that "an attorney

ad litem should have been appointed with respect to any cognitive or intellectual

deficit so as to properly ensure Mother's true needs were carried out during the

pendency of this case and towards the ultimate goal of reunification." The parents

---

[8]Paragraph 7 of the trial court's termination order is titled "Termination of Respondent Father['s] . . . Parental Rights." In Subparagraph 7.2.3, the trial court found that Father "failed to comply with the provisions of a court order that specifically established the actions necessary for <u>the mother</u> to obtain the return of the children . . . pursuant to § <u>161.00(b)(1)(O)</u>, Texas Family Code." [Emphases added.] *See* Tex. Fam. Code Ann. § 161.001(b)(1)(O). The Department contends that these are clerical errors and urges us to modify the judgment. We agree that these errors are clerical, and we will thus modify the trial court's judgment to correct them. *See In re L.F.*, No. 02-19-00421-CV, 2020 WL 2201905, at *4–5 (Tex. App.—Fort Worth, May 7, 2020, no pet.) (mem. op.); *In re D.M.*, No. 04-14-00059-CV, 2014 WL 2917458, at *3–4 (Tex. App.—San Antonio June 25, 2014, no pet.) (mem. op.); *see also* Tex. R. App. P. 43.2(b).

contend that the trial court's failure to appoint Mother an attorney ad litem violated Mother's due-process rights.

Section 161.003 allows termination of a parent's rights if the parent has a mental or emotional illness or mental deficiency that renders her unable to provide for her child's physical, emotional, and mental needs until the child's eighteenth birthday. *See id.* § 161.003(a). The trial court must appoint an attorney ad litem to represent the parent "[i]mmediately after the filing of a suit under [Section 161.003]." *Id.* § 161.003(b).

Here, the Department did not seek to terminate Mother's parental rights under Section 161.003; it sought to terminate her rights under Section 161.001. *See id.* §§ 161.001, .003. The trial court was thus not required to appoint Mother an attorney ad litem under Section 161.003(b). *See id.* § 161.003(b); *cf. In re J.J.*, No. 02-20-00218-CV, 2020 WL 7639579, at *5 (Tex. App.—Fort Worth Dec. 23, 2020, no pet.) (mem. op.) ("Section 161.003 is not the exclusive way to terminate the parental rights of someone with a mental illness or deficiency."). The trial court did, however, appoint attorneys ad litem for Mother and Father a few days after the Department sued to terminate their parental rights, presumably because they were indigent and were thus entitled to appointed counsel. *See* Tex. Fam. Code Ann. § 107.013(a). These attorneys represented the parents through trial. We overrule parents' ninth issue.

## III. Extension of Time to Complete Parenting Plan

In their fourth issue, Mother and Father complain that the trial court erred by "failing to extend the time to provide [them] the ability to complete the final requirement of their parenting plan."

As the June 8, 2020 statutory dismissal date was approaching, the Department moved the trial court on April 29, 2020, to retain jurisdiction and to set a new dismissal date. *See id.* §§ 263.401, .403(a-1). On May 18, 2020, the trial court granted the motion and extended the case's dismissal date to November 13, 2020. The trial commenced on October 2, 2020.

The parents contend that because they completed all services except those not available to them and because the Department's witnesses testified that the parties performed all services requested of them before COVID-19 restrictions were put in place, the trial court should have extended the time for the parents to complete their service plans. But Mother and Father did not ask the trial court for more time to complete their services. They have thus failed to preserve this issue for our review. *See* Tex. R. App. P. 33.1(a)(1)(A) (explaining that to preserve a complaint for appellate review, a party must present to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, if not apparent from the request's, objection's, or motion's context). We overrule parents' fourth issue.

## IV. The Trial Court's Evidentiary Rulings

The parents' fifth and eighth issues challenge the trial court's admission of evidence. In their fifth issue, the parents complain that the trial court erred by admitting evidence regarding Myra and Anne. In their eighth issue, the parents complain that the trial court erred by admitting Mother's psychological examination.

### A. Evidence regarding Myra and Anne

The parents claim that the trial court erred by admitting evidence about Myra and Anne and by "considering it as evidence of the parents' inability to care for their children when all evidence indicated the Department had temporary managing conservatorship of the girls for seventeen months" because the Department later dismissed the termination case as to Myra and Anne and returned them to the parents.

The parents did not object to the admission of any evidence regarding Myra and thus waived any appellate complaint concerning the admission of such evidence. *See* Tex. R. App. P. 33.1(a)(1)(A); *see also* Tex. R. Evid. 103(a)(1); *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh'g). Mother and Father each objected to Leal's testifying regarding Anne's association with suspected sex traffickers. The parents argued that such evidence was irrelevant to the termination of their parental rights to Ross, Finn, Macy, and Penny because the Department had represented that it was going to dismiss the case as to Anne. In response, the Department explained that Leal's testimony about Anne "speaks to the overall need to protect all of these

children, including a young female child, [Macy], and what dangers might be posed to her if she were returned home." The trial court overruled the parents' objections.

We review a trial court's rulings in admitting or excluding evidence for an abuse of discretion. *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 347 (Tex. 2015). And as the long-established formulation has it, a trial court abuses its discretion if it acts without reference to any guiding rules or principles—that is, if it acts arbitrarily or unreasonably. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). Just because we might have ruled differently under the circumstances does not mean that we can hold that a trial court abused its discretion. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see Low*, 221 S.W.3d at 620. If the record shows any legitimate basis for an evidentiary ruling, we must uphold that ruling. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

Here, although the Department indicated that it intended to dismiss its termination suit as to Myra and Anne, Leal's testimony regarding Anne's association with suspected sex traffickers was relevant to at least two of the factors the trial court could consider in determining whether termination was in the four younger children's best interest: the parents' parenting abilities and the possible future emotional and physical danger to the children. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). We thus conclude that the trial court did not abuse its discretion by allowing

testimony about Anne's association with suspected sex traffickers, and we overrule the parents' fifth issue.

**B. Mother's psychological evaluation**

The parents next complain that the trial court erred by (1) admitting Mother's psychological evaluation into evidence and allowing Leal to "read into the record a sliver of an opinion . . . rendered by an unqualified expert containing a blanket statement that . . . Mother was unable to care for her children based on her psychological evaluation" and (2) by overruling "counsel's objection as to [the] right to cross-examination."

Here, Mother's and Father's psychological evaluations and accompanying business-records affidavit were served on the parents more than 14 days before trial. *See* Tex. R. Evid. 803(6), 902(10). Neither parent raised a pretrial objection. When the Department initially offered them into evidence at trial, Mother stated that she had no objection. Father, however, lodged the following objection in an exchange with the trial-court judge:

> [Father's attorney]: Your Honor, I believe -- I believe they are self-authenticated in the sense of we don't need a Business Records Affidavit or a custodian of records to come present these; however, I'm going to object to any attempt to interpret any of -- anything that's being said or was stated within the -- the medical records themselves.
>
> THE COURT: So you're preempting the objection?
>
> [Father's attorney]: Well, I'm objecting to them coming in. I do have an objection.

27

THE COURT: Okay. Make sure I understand. You said that -- you said -- it sounded like you contradicted and I just want to make sure. You said that they're self-authenticating. You said that you have no objection to them --

[Father's attorney]: Well, they're just self-authenticating with regards to we don't need a medical records -- a custodian of records to testify these are the actual records, but for any other purpose, I'm objecting to them.

The trial court then admitted the evaluations and affidavit into evidence.

To preserve a complaint for appellate review, a party must present to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling, if not apparent from the request's, objection's, or motion's context. Tex. R. App. P. 33.1(a)(1)(A); *see also* Tex. R. Evid. 103(a)(1). If a party fails to do this, error is not preserved. *Bushell*, 803 S.W.2d at 712. A specific objection is one that enables the trial court to understand the precise grounds so as to make an informed ruling and that affords the offering party an opportunity to remedy any defect, if possible. *See* Tex. R. App. P. 33.1(a); Tex. R. Evid. 103(a)(1); *Campbell v. State*, 85 S.W.3d 176, 185 (Tex. 2002); *McDaniel v. Yarbrough*, 898 S.W.2d 251, 252 (Tex. 1995). To be specific, an objection must "clearly and distinctly" make the trial court aware of the party's complaint. *Equistar Chems., L.P. v. Dresser-Rand Co.*, 240 S.W.3d 864, 868 (Tex. 2007).

Here, Mother did not object to the psychological evaluations and thus failed to preserve her complaint regarding their admission. *See* Tex. R. App. P. 33.1(a)(1)(A); *see*

*also* Tex. R. Evid. 103(a)(1); *Bushell*, 803 S.W.2d at 712. We overrule this portion of the parents' eighth issue.

Father did not dispute that the psychological evaluations were admissible under Texas Rule of Evidence 902(10). *See* Tex. R. Evid. 902(10). His objection—to any attempt to interpret the records and to use them "for any other purpose"—was not specific enough for the trial court (or us) to understand the nature of his complaint. To the extent that Father's objection could be construed as complaining that the psychological evaluations were inadmissible hearsay, that complaint does not comport with the complaint Father makes on appeal—that the psychologist was an unqualified expert. Father has thus failed to preserve this complaint for our review, and we overrule this portion of the parents' eighth issue. *See* Tex. R. App. P. 33.1(a); *F.C. v. Tex. Dep't of Family & Protective Servs.*, No. 03-19-00625-CV, 2020 WL 101998, at *5 (Tex. App.—Austin Jan. 9, 2020, no pet.) (mem. op.).

After the trial court admitted the psychological evaluations, the Department asked Leal to read aloud portions of Mother's evaluation, which Leal began to do verbatim. Mother then objected, explaining that she believed that Father was correct before: "I don't think this is the proper sponsor. We cannot cross-examine [Leal] based on what this counselor wrote. If the counselor was here, I think all that language comes in, but as of right now, I think it cannot come in through the caseworker." The Department responded

And, Your Honor, I believe these are business records. They're records that are kept in the regular course of the business, they're made in the regular course of her business, and what's contained in them is free to be read into the record. It's not hearsay because it is authenticated and it is an exception to the hearsay rule under the business records predicate. I'm not asking [Leal] to interpret any of these, but to simply read the words that are written on this page.

Father agreed with Mother "with regards to any interpretation" and added,

I haven't any further objection, and I agree with [Mother] with regards to any interpretation. Any interpretation with regards to these, they're trying to assume -- or trying to presume anything from the reading other than just plain reading and moving on, that's one thing. But if [the Department]'s trying to -- [the Department]'s going to try to cross-examine [Leal] on these, then I'm going to object.

The trial court overruled the objection.

As noted, a party must make a timely objection to preserve a complaint for appellate review. *See* Tex. R. App. P. 33.1(a)(1)(A); *see also* Tex. R. Evid. 103(a)(1). An objection is timely if made at the point evidence is offered and before the evidence is admitted. *See* Tex. R. Evid. 103; *Bushell*, 803 S.W.2d at 712. An objection to evidence that was previously admitted without objection comes too late. *Perry Homes v. Alwattari*, 33 S.W.3d 376, 386 n.10 (Tex. App.—Fort Worth 2000, pet. denied).

On appeal, the parents assert that the trial court erred by overruling this objection "as to [the] right to cross-examination of the witnesses' statement that . . . Mother was 'unable to care properly for her children.'" As best we can tell, the parents' trial objection and complaint on appeal appear to be that the trial court's admission of the psychologist's evaluations under the business-records exception to

the hearsay rule deprived them of their right to cross-examine the psychologist who examined the parents and prepared the evaluations. But by the time Mother and Father lodged this objection, the evaluations had already been admitted into evidence and their objection was too late. *See id.* We thus overrule the remainder of the parents' eighth issue.

## V. Evidence Supporting Termination of Mother's and Father's Parental Rights

In their first, second, and sixth issues, Mother and Father challenge the legal and factual sufficiency of the evidence to support the trial court's findings (1) that they violated the two endangerment grounds in Family Code Section 161.001(b)(1)(D) and (E); (2) that they failed to complete their service plan; and (3) that termination of their parental rights was in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O), (b)(2).

### A. Burden of proof and standards of review

For a trial court to terminate a parent–child relationship, the party seeking termination must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. *Id.* § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

31

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant them with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the parents violated a predicate ground listed in Section 161.001(b)(1) and that the termination of the parent–child relationship would be in the children's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder

reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

Clear and convincing evidence of one pleaded conduct ground is sufficient to support a termination decision if coupled with sufficient best-interest evidence. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *In re D.M.*, 58 S.W.3d 801, 813 (Tex. App.—Fort Worth 2001, no pet.). But if one of the pleaded and found conduct grounds is based on endangerment—Section 161.001(b)(1)(D) or (E)—then we must fully address that ground, if presented on appeal, based on the future collateral consequences of such a finding. *See In re N.G.*, 577 S.W.3d 230, 235–37 (Tex. 2019); *see also* Tex. Fam. Code Ann. § 161.001(b)(1)(M) (allowing termination of parent's parental rights if such rights to another child had been terminated under Section 161.001(b)(1)(D) or (E)).

## B. The trial court's endangerment findings

As noted, the parents argue that the evidence is legally and factually insufficient to support the trial court's findings that they violated the two endangerment grounds in Section 161.001(b)(1)(D) and (E) of the Family Code. Because we conclude that sufficient evidence supports termination under Subsection (E), we will not address Subsection (D). *See In re T.C.*, No. 02-19-00291-CV, 2019 WL 6606172, at *1 n.3 (Tex. App.—Fort Worth Dec. 5, 2019, pet. denied) (mem. op.) ("We read *N.G.* to say that an affirmance under either (D) *or* (E) suffices because under (M) an affirmance under

one makes the other moot."); *see also In re A.S.*, No. 02-19-00422-CV, 2020 WL 990028, at *5 (Tex. App.—Fort Worth Mar. 2, 2020, no pet.) (mem. op.).

Subsection (E) provides that parental rights may be terminated if the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct [that] endangers the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(E). To "endanger" means to expose a child to loss or injury, or to jeopardize a child's emotional or physical health. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *see In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996); *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Under Subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *J.T.G.*, 121 S.W.3d at 125. Subsection (E) requires not just a single act or omission but rather a voluntary, deliberate, and conscious course of conduct by the parent. *Id.*

Mother asserts that given her limited cognitive functioning, she could not have knowingly engaged in conduct that endangered her children's physical and emotional well-being. But the statute's plain language does not require that a parent knowingly engage in endangering conduct. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E). To support termination under Subsection (E), it is not necessary to establish that a parent intended to endanger a child. *See M.C.*, 917 S.W.2d at 270. Nor is it necessary to establish that the conduct was directed at the child or that the child actually suffered

34

injury. *Id.* at 269; *Boyd*, 727 S.W.2d at 533. Rather, it is sufficient if the parent's conduct endangered the child's well-being. *See Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 616–17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Moreover, the endangering conduct does not have to occur in the child's presence. *Id.* at 617. And the conduct may occur before the child's birth and either before or after the child's removal by the Department. *Id.*; *see J.O.A.*, 283 S.W.3d at 345. A parent's past endangering conduct may create an inference that the past conduct may recur and further jeopardize the child's present or future physical or emotional well-being. *See D.M.*, 58 S.W.3d at 812.

Here, Mother and Father argue that there is no evidence or insufficient evidence to support the trial court's findings that they engaged in conduct that endangered their children's physical or emotional well-being or knowingly placed their children with persons who engaged in conduct that endangered their physical or emotional well-being. We disagree.

Mother was the children's primary caretaker. Brown reported that the floors of the family's home had mud and dirt on them, the house smelled of human urine, and there were "tons of bugs and flies." The home was so unsanitary that Brown feared that the children would get sick from the home's condition. Brown also reported that the children were wearing tattered clothes and were extremely dirty. According to Brown, the children had not bathed in a very long time and their body odor was so strong that "[i]t was to the point where I was getting sick interviewing them[,] and I

35

was going to have to leave at one point because I couldn't stay in there any longer with the odor." When confronted, Mother was unconcerned with the home's condition and her children's cleanliness; Father claimed that "he had no idea what was going on," even though he lived there.

During the FBSS case, then six-year-old Penny was hospitalized. At that time, she weighed 25 pounds and was extremely malnourished and dirty. Her lice-infested hair was so matted that it had to be cut to treat the lice. When Green spoke with both parents about Penny's failure to thrive, both parents claimed that they were unaware that Penny's weight was an issue, even though then-six-year-old Penny was the size of a toddler. Leal testified that she believed that Penny was in grave danger due to the parents' medical neglect.

Neglect can be just as dangerous to a child's emotional and physical health as intentional abuse. *In re E.A.W.S.*, No. 2-06-00031-CV, 2006 WL 3525367, at *10 (Tex. App.—Fort Worth Dec. 7, 2006, pet. denied) (mem. op.). By allowing the children to live in such unsanitary conditions at home, Mother and Father endangered each child's health and physical well-being. *See, e.g., In re M.C.*, 917 S.W.2d at 270; *In re W.R.E.*, 167 S.W.3d 636, 642 (Tex. App.—Dallas 2005, pet. denied). Moreover, the evidence of Mother's and Father's continued neglect of Penny—which resulted in her hospitalization during the FBSS case—supports a finding that the parents engaged in a course of conduct endangering all the children's physical or emotional well-being. *See In re C.E.K.*, 214 S.W.3d 492, 497 (Tex. App.—Dallas 2006, no pet.) (stating that if

a parent abuses or neglects the other parent or children, that conduct can be used to support a finding of endangerment); *see also E.A.W.S.*, 2006 WL 3525367, at \*10 ("If a parent abuses or neglects the other parent or children, that conduct can be used to support a finding of endangerment even against a child who was not yet born at the time of the conduct."); *In re D.T.*, 34 S.W.3d 625, 636–37 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g) (stating that evidence of conduct before child is born, as well as evidence of how a parent has treated another child or spouse, is relevant regarding whether a course of conduct under Subsection (E) has been established).

Viewing the evidence in the light most favorable to the trial court's Subsection (E) findings, we conclude that a reasonable factfinder could have formed a firm belief or conviction that Mother and Father had engaged in conduct or had knowingly placed Ross, Finn, Macy, and Penny with persons who had engaged in conduct that endangered the children's physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E); *J.P.B.*, 180 S.W.3d at 573. We thus hold that the evidence is legally sufficient to support the trial court's Subsection (E) findings. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E); *J.P.B.*, 180 S.W.3d at 573. And based on our review of the entire record and giving due deference to the factfinder's Subsection (E) findings, we likewise conclude that the factfinder reasonably could have formed a firm conviction or belief that Mother and Father had engaged in conduct or had knowingly placed Ross, Finn, Macy, and Penny with persons who had engaged in conduct that endangered the children's physical or emotional well-being. *See* Tex. Fam. Code Ann.

37

§ 161.001(b)(1)(E); *C.H.*, 89 S.W.3d at 18–19. We thus hold that the evidence is factually sufficient to support the trial court's Subsection (E) findings. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E); *C.H.*, 89 S.W.3d at 18–19.

Because the evidence is legally and factually sufficient to support termination under Subsection (E), Mother's and Father's challenges to the sufficiency of the evidence supporting the trial court's findings under Subsection (D) (endangering environment) are moot. *See* Tex. Fam. Code Ann. § 161.001(b)(1); *A.S.*, 2020 WL 990028, at *5; *T.C.*, 2019 WL 6606172, at *1 n.3. Similarly, we need not address the sufficiency of the evidence to support the other conduct ground—Subsection (O) (failure to complete service plan)—found by the trial court, except as to correct the judgment as to Father. *See* Tex. R. App. P. 47.1; *see also* Tex. Fam. Code Ann. § 161.001(b)(1); *A.V.*, 113 S.W.3d at 362; *In re D.D.G.*, 423 S.W.3d 468, 475 (Tex. App.—Fort Worth 2014, no pet.).[9]

## C. The trial court's best-interest findings

The parents also challenge the legal and factual evidentiary sufficiency to support the trial court's findings that termination of their parental rights was in the best interest of Ross, Finn, Macy, and Penny.

---

[9]But for correcting the judgment's harmless clerical errors, we likewise need not address Mother and Father third and seventh issues, which relate to the trial court's Subsection (O) findings. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(O), (d); *see also* Tex. R. App. P. 47.1.

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of nonexclusive factors that the factfinder may apply in determining the child's best interest:

- the child's desires;

- the child's emotional and physical needs now and in the future;

- the emotional and physical danger to the child now and in the future;

- the parental abilities of the individuals seeking custody;

- the programs available to assist these individuals to promote the child's best interest;

- the plans for the child by these individuals or by the agency seeking custody;

- the stability of the home or proposed placement;

- the parent's acts or omissions indicating that the existing parent–child relationship is not a proper one; and

- any excuse for the parent's acts or omissions.

*See Holley*, 544 S.W.2d at 371–72; *see also E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may suffice to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

On appeal, Mother and Father recite the law applicable to the best-interest analysis but do not analyze it under this case's facts. We will nonetheless undertake the analysis ourselves.

*As to the children's desires*, because Ross had limited verbal abilities and Penny is nonverbal, they were most likely incapable of expressing their desires; Finn and Macy might have been capable of expressing their desires, but the Department presented no such evidence. There was evidence, however, that the children loved and were bonded with Father. This factor thus weighs slightly against terminating Father's parental rights to the children. *See In re M.H.*, 319 S.W.3d 137, 150 (Tex. App.—Waco 2010, no pet.). As to Mother, this factor weighs neither in favor of nor against termination of Mother's parental rights to the children. *See E.N.C.*, 384 S.W.3d at 808.

*Regarding the physical and emotional needs of the children now and in the future and the physical and emotional danger to the children now and in the future*, the record reflects that each child—especially Penny—has specialized needs. As outlined in detail above, each of

40

the children is medicated and requires various forms of therapy. Penny has highly specialized medical needs, requires special medical equipment, is under the care of several different doctors, and is fed through a G-tube. The parents never proved that they could meet Penny's needs, especially regarding how to use and care for Penny's G-button. O'Brien believed that the children were at substantial risk if Mother's and Father's parental rights were not terminated because the parents could not meet all the children's medical and developmental needs. Additionally, Mother's and Father's attitudes toward Myra's and Anne's behavior raised concerns that the children—especially Macy—could become sex-trafficking victims in the future.

Moreover, a psychologist diagnosed both parents with "borderline intellectual functioning" and concluded that Mother had "very limited cognitive skills and is not likely to appropriately make decisions in the best interest of herself and her children" and that "[i]t is likely that [she] will need supervision and support with her children and should not be in a decision-making and primary caretaking capacity." *See, e.g., In re D.A.T.*, No. 02-10-00335-CV, 2012 WL 1947338, at *11 (Tex. App.—Fort Worth May 31, 2012, pet. denied) (mem. op. on reh'g) (considering evidence that parent was borderline intellectual functioning and needed assistance with making legal, medical, and financial decisions in best-interest analysis). Regarding Father, the psychologist concluded that he would "not be well-suited for a daily caregiving role." *See id.*

Neither Leal nor O'Brien believed that the parents could or wanted to take care of their children's needs. According to Leal, "it's not just about their disabilities

41

because I prompt them and they understand what I'm telling them. It's more about them not making significant life changes to be able to take care of their four children." In fact, the Department had been involved with the family off and on regarding the same concerns (the children's weight and the home's condition) for several years. Each time, the children and the home would improve when the Department was involved with the family, but the parents would later regress.

In short, the evidence casts doubt on the parents' ability to (1) understand their children's needs and provide for their physical and emotional needs now and in the future and (2) understand and recognize the physical and emotional danger to the children now and in the future. We thus conclude that the trial court was entitled to find that these factors weighed in favor of terminating Mother's and Father's parental rights.

*As to the parents' parenting abilities*, the evidence showed that Mother and Father love their children. Although Leal worked one-on-one with the parents to inform and educate them on each of their children's needs, the parents failed to demonstrate to Leal that they could meet those needs and parent their children. The parents attended the scheduled visits with the children but struggled to interact with and supervise them. Leal had to prompt the parents to engage and interact with the children. During these visits, Mother and Father never proved that they could meet Penny's needs (especially how to care for and use Penny's G-button) and thus never progressed to unsupervised visitation. According to Leal, the parents "failed to demonstrate

significant life changes . . . as far as parenting goes." Mother, the main caregiver, failed to demonstrate that she knew what is required on a day-to-day basis to care for the children or had any interest in learning what is required. And Leal and the psychologist did not think that Father could take over the caretaking role. Father's trial testimony confirmed this fear as he was unable to testify about each child's particular needs. Plus, the parents' attitudes toward Myra's and Anne's behavior raised concerns about their abilities to effectively parent the younger children. We conclude that the trial court was entitled to find that this factor weighed in favor of terminating Mother's and Father's parental rights.

*Regarding the programs available to assist the parents in promoting the children's best interests*, the record reflects that the parents satisfied most of their service plan's requirements. They were unable to complete the parenting class and an online class regarding sex trafficking, but the Department admitted that those failures were not the parents' fault. In fact, the trial judge stated on the record that he was "concerned in this case that the Department didn't do all [it] could do to take care of the services that were ordered." We conclude that this factor weighs against terminating Mother's and Father's parental rights.

*As to the parents' and the Department's plans for the children*, Father testified that he and Mother had done everything that the Department had asked them to do and that he thinks they are much more capable of taking care of the children than they were before the children's removal. He further claimed that he and Mother were willing to

43

do whatever they needed to do to take care of the children, including taking them to medical and therapy appointments and making sure that they are eating and are taken care of. But again, Father was unable to describe each child's particular needs, and the Department believed that terminating Mother's and Father's parental rights was in the children's best interest. All the children are doing well in foster care and are receiving the medication and treatment that they need. Macy's foster placement wants to adopt her, and Foster Mother has a strong bond with Penny, loves her, and wants to continue to foster Penny. Ross and Finn are doing well in their current placements, and the Department's plan is to move them into an adoption-motivated home together. We conclude that the trial court was entitled to find that this factor weighed in favor of terminating Mother's and Father's parental rights.

*Regarding the stability of the parent's home*, the Department admitted that the family had a stable home (they had lived there more than ten years). Father testified that he owns the home and has maintained the same job for 22 years. The home was safe and had water and electricity, there was food in the home, and the home's condition had improved, even though Leal said it still had a "foul odor." We conclude that this factor weighs against terminating Mother's and Father's parental rights.

*As to the parents' acts or omissions indicating that the existing parent–child relationship is not a proper one and any excuse for the parents' acts or omissions*, the record reflects that the children were removed because of the parents' neglect and that the parents had been neglecting these children for most, if not all, of their lives. Mother did not testify at

trial to offer any excuse for her behavior, but the Department offered evidence that she was unconcerned with her children's conditions and was unwilling to learn what she needed to do to care for them. When Father was asked whether he understood that the Department had been involved in the family's life for a decade because it thought that he and Mother were not able to care for their children, Father said that they could take care of them. Father said that they had "never caused any damage to anyone and even less to our children." But the evidence in this case contradicts Father's testimony. We conclude that the trial court was entitled to find that this factor weighed in favor of terminating Mother's and Father's parental rights.

We recognize that not all the *Holley* factors weighed in favor of terminating Mother's and Father's parental rights to Ross, Finn, Macy, and Penny. Even so, we conclude that, viewing the evidence in the light most favorable to the trial court's best-interest findings, a reasonable factfinder could have formed a firm belief or conviction that termination of Mother's and Father's parental rights was in the children's best-interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *J.P.B.*, 180 S.W.3d at 573. We thus hold that the evidence is legally sufficient to support the trial court's best-interest findings. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *J.P.B.*, 180 S.W.3d at 573. And based on our review of the entire record and giving due deference to the factfinder's best-interest findings, we conclude that the factfinder reasonably could have formed a firm conviction or belief that termination of Mother's and Father's parental rights was in the children's best-interest. *See* Tex. Fam. Code Ann.

§ 161.001(b)(2); *C.H.*, 89 S.W.3d at 18–19. We thus hold that the evidence is factually sufficient to support the trial court's best-interest findings. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *C.H.*, 89 S.W.3d at 18–19.

## D. Conclusion

Having found that the evidence is legally and factually sufficient to support the trial court's Subsection (E) and best-interest findings as to both parents, we overrule their first, second, and sixth issues.

## VI. Conclusion

We modify Subparagraph 7.2.3 of the trial court's judgment (1) to delete "mother" and replace it with "father" and (2) to delete "161.00(b)(1)(O)" and replace it with "161.001(b)(1)(O)." Having overruled all the issues necessary for our disposition of this appeal, we affirm as modified the trial court's judgment terminating Mother's and Father's parental rights to Ross, Finn, Macy, and Penny. *See* Tex. R. App. P. 43.2(b).

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: May 20, 2021